# NORBERT HOLLERMAN AND ANOTHER v. F. H. PEAVEY & COMPANY AND OTHERS.

130 N. W. (2d) 534.

August 28, 1964—No. 39,210.

222

*Cant, Haverstock, Beardsley, Gray & Plant* and *Franklin D. Gray,* for appellant F. H. Peavey & Company.

*Dorsey, Owen, Marquart, Windhorst & West* and *Peter Dorsey,* for appellant E. G. Clinton Company.

*Robins, Davis & Lyons* and *Elliott S. Kaplan,* for appellant Jack Frost Hatchery Company.

*Robins, Davis & Lyons* and *Bernard Rosenberg,* for appellant Farmers Produce Company.

*Ryan, Ryan & Ebert* and *Donald I. Ryan,* for respondents.

MURPHY, JUSTICE.

This case is before us on an appeal from an order denying a motion of defendants for judgment notwithstanding the verdict or in the alternative for a new trial in an action for damages for fraud. Numerous errors are alleged, three of which we consider. Defendants assert (1) that the record fails to establish fraud; (2) that the court erred in permitting testimony relating to transactions between defendants and third parties; and (3) that the damages are excessive and unsupported by the record. There are various cross-claims among defendants, but they are not involved in this appeal. Defendants are treated as being jointly charged with fraud.

The dispute before us grows out of a contract entered into by plaintiffs, husband and wife who operate a farm, and certain defendant corporations who had entered into an arrangement to effect the sale of their products and services, all of which have to do with the feeding, production, and processing of chicken broilers. Defendant F. H. Peavey & Company is engaged in the production and manufacture of poultry feed. Prior to the events in this case, Peavey joined forces with defendants Farmers Produce Company and Jack Frost Hatchery Company agreeing that Jack Frost was to supply the chicks, Peavey was to supply the feed, and Farmers Produce was to process and market the grown broiler chickens. The arrangement comprehended that the in-

dividual farmer would be made a part of the project, and would provide the facilities for raising the chickens, including the building, feeding, water, heating and ventilating equipment, and the labor. Defendant E. G. Clinton Company was brought into the picture to supply the physical equipment, including the building necessary for raising of poultry. The participating farmer was told that the cost of the building would be approximately $21,000 together with carrying costs, $5,200 to be paid down and the balance to be repaid in 20 quarterly installments. In addition, he would be required to invest $10,367.87 in feeding, water, and ventilating equipment, with an additional approximate $2,500 for bins, motors, and other equipment.

From the record it appears that on November 26, 1960, the plaintiffs entered into a contract with defendants. They ordered a building from the Clinton Company and executed a conditional sales contract in which the mortgage holder on the farm joined. They agreed to purchase the produce and services of the defendant companies. Peavey was to furnish the feed and "flock management counsel"; Jack Frost was to furnish "healthy fast growing" broiler-type chicks; and the Farmers Produce Company was to furnish "the processing and marketing plant and effort." Before entering into the contract, however, plaintiff Norbert Hollerman discussed the program with Richard Gessell, Peavey's sales agent, and Nathan Adams, a Clinton salesman. With Gessell he visited two farms where the program was in operation and at one of these was told that the first flock raised under the program had brought a greater return than estimated.

After the contract was entered into, the building erected, and equipment installed, the Hollermans raised three flocks of chickens. There were approximately 25,000 chicks in each flock. The first flock was marketed with satisfactory results. Defendants concede that plaintiffs did a good job with their chickens. The results with the last two flocks were disastrous. In the second flock 837 chickens died and 4,459 were condemned. In the third flock 2,757 chickens died and 7,791 were condemned. The cause of mortality and condemnations was airsacculitis, an infection of the airsac, which is a part of the chicken's respiratory system. The plaintiffs assert that they have suffered a loss of approxi-

mately $57,000 as a result of this venture. They assert that they were induced to enter into it because of false and fraudulent representations made to them by defendants. The false representations relied upon are to be found in a brochure, which was given to the plaintiffs by the defendants, and in the oral statements and representations of Peavey's agent, Richard Gessell.

The brochure describing the venture in which plaintiffs were invited to participate explained the advantages of a plan in which a farmer could establish a stable poultry business through an association with a well-established feed manufacturer, a producer of chicks, and a processor who would buy the chicken broilers at a "guarantee minimum price." The prospective grower was told that he would be required "to furnish suitable growing facilities, to use Peavey Feed and participating hatchery chicks and to follow a growing program established by Farmers Produce, Peavey and hatchery." It was explained that while the program did not provide a "panacea for a bad manager or an inefficient grower," it would "shield him from losses because of possible depressed market conditions." The prospective feeder was assured, "The plan and programs described here will return to the careful broiler raiser an income roughly equal to half as much as is obtained from an average size farm in the Midwest—and it will do so for about 6 hours of one person's attention daily." The brochure continues, "Your success with this plan is virtually assured, if you follow the plan as described. It puts you in a money-making business with experienced 'blue chip' organizations." With reference to the health problem the brochure assures the prospective grower that broilers can be raised in Minnesota with "fewer disease and management problems" than elsewhere. The grower is assured that he is "always going to get paid at least the minimum, or advance price" and that the strength of the program is backed by "the Peavey Company with a record of more than 80 years fair dealing with farmers and successful business management in farm product sales and service. It is backed by the largest processor and marketer of poultry in the Upper Midwest, with sales contracts and experience dealing with most of the large food chains in the nation. It

is backed by a responsible hatchery with an outstanding record of breeding and supplying healthy, fast-growing broiler chicks."

"This is a solid substantial program which combines the elements of security and success for the broiler raisers who become affiliated with them."

The brochure further represents that "Millions of broilers have been raised in the Upper Midwest, many of them under Peavey-Tone programs, and close records have been kept." It pointed out, "Some costs may vary slightly, but the following costs will occur for average good feeders. * * * If the birds sell at 20¢ a lb., it would more than double this broiler grower's profit."

The brochure further represents that defendants "are trying to protect the grower with a market above the average good feeder's cost and offer the efficient feeder a chance to make a fine income in times of good broiler prices." It was estimated that the cost of medication and supplies would come to .09¢ per pound or $78.75 for a flock of 25,000 chicks averaging 3½ pounds each.

Before entering into the contract plaintiffs discussed with Peavey's agent the dangers of loss from disease in the growing of broiler chickens. Their previous experience had been limited to the raising of small flocks of laying hens. They inquired from defendants' representative as to the danger of sickness and were told that it was negligible. The plaintiff testified:

"I said, 'In a big flock like that disease can get to be a serious problem,' I said, 'if it breaks out.' And I was told, 'That's the least of your worries,' that they have their District Manager and he makes his rounds every two weeks and checks these chickens, and if there is anything in there, he is going to see it way before we will and then they will have the medication to take care of it."

Plaintiff understood this statement as confirming his understanding from references to "management counsel" in the brochure that defendants would assist him in meeting any danger that might arise from disease among the flocks. Gessell, the Peavey agent, admitted that he "painted a rosy picture for those people on disease" and that he said that disease would not be a big worry.

There are certain factual statements contained in the foregoing summary which form the basis for plaintiffs' claim of fraud. Profit figures in the brochure are based on a cost of 12¢ per chick (12¼¢ debeaked); yet it appears that when plaintiff signed the contract on November 26, 1960, the price of a chick had been raised to 13¢, effective December 1, 1960. The claim that "Millions of broilers" had been raised under the Peavey-Tone programs and records kept with reasonable exactness on feeder costs appears to have been based upon the experience of four flocks of 9,000 each raised on a farm in southern Minnesota which were checked against results with 111,000 other birds raised in the same area and against results on two farms in Wisconsin under a competing program. The figures in the brochure were based on a total of 17 flocks, many with less than 25,000 birds. The representation that "[i]f the market were to average the broiler prices of the last ten years, you would make even more money," while literally true, is misleading. During those 10 years the average price had been steadily declining to the point where in 1960 the price was 17.1¢, a fact which defendants knew but which plaintiffs did not. The plain implication of the statement in the brochure is that the plaintiffs could expect to receive more than 18¢ per pound, while the import of the figures themselves is to the contrary. The brochure conveyed to the plaintiffs the impression that a competent farmer would receive a guaranteed profit. Plaintiffs asserted that they were told that the spread between cost and price received would not be reduced, and that if the guaranteed price would be reduced, costs would be reduced as well. The Peavey representative confirmed that he told plaintiffs that under the program costs would be stable and "they would not get the real high or the real low." This impression is confirmed by the brochure which asserts that the plan "[a]ssures a basic profit making price for the competent feeder." It is clear that there was no intention to assure a profit to plaintiffs when these representations were made. Just before plaintiffs signed up, it was decided to raise the cost of chicks, although there was no increase in the guaranteed sales price.

If it is doubtful that the representations of the brochure amount to more than expressions of opinion or estimates, it must be conceded that

the affirmations of Peavey's representative to plaintiffs on the disease of chicks are material. The risks of disease in the raising of chickens was a matter of great concern to plaintiffs; it was a subject on which they were without specialized knowledge and in regard to which they had a right to assume that the Peavey representative would have accurate and dependable information. The representations in this area were essentially that disease was a minor problem which could be successfully met with the "medicated" or "potentiated" feed which Peavey would supply.

Defendants concede that this was a representation of fact rather than an estimate of future events, but they argue that the representation was true when made. They claim there was no evidence that airsacculitis was a problem in Minnesota in 1960 and submitted the testimony of a veterinary bacteriologist to that effect. Nevertheless, the record establishes that airsacculitis was a considerable problem in the south and east in 1960, and although it was not a substantial problem in Minnesota at that time, it was in danger of becoming one. In fact, there had been serious outbreaks of disease in a few flocks before plaintiffs entered the agreement. The substance of the representation was not just that there was no disease problem in Minnesota in 1960, but that none was reasonably anticipated.

The inability of defendants, despite their representations, to cope with the disease problem is abundantly shown, not only by plaintiffs' experience but by the experience of several other participating farmers who testified. Most of these farmers suffered losses about the same time plaintiffs did.

■ With this background we may consider the first assigned error which is that there was not sufficient competent evidence to sustain a finding of fraud. Since there is no substantial evidence that the defendants did not believe that competent growers would make a good profit under their program, it is important to determine whether there are misstatements of fact involved in the representations made to plaintiffs. It is well established that if a person represents as true material facts susceptible of knowledge, to one who relies and acts thereon to his injury, the one making the representations cannot defeat recovery

by showing that he did not know his representations were false or that he believed them to be true. The rule which we follow in this state, derived from Wilder v. De Cou, 18 Minn. 421 (470), is summarized in 8A Dunnell, Dig. (3 ed.) § 3818, as follows:

"A person is liable for fraud if he makes a false representation of a past or existing material fact susceptible of knowledge, knowing it to be false, or as of his own knowledge without knowing whether it is true or false, with intention to induce the person to whom it is made to act in reliance upon it, or under such circumstances that such person is justified in acting in reliance upon it, and such person is thereby deceived and induced to act in reliance upon it, to his pecuniary damage."

We pointed out in Swanson v. Domning, 251 Minn. 110, 86 N. W. (2d) 716, that an intent to deceive is no longer necessary, nor is it necessary to prove that the defendants knew the representations were false. We said (251 Minn. 115, 86 N. W. [2d] 720):

"Fraudulent intent may be proved by showing that the party knew his statements to be false; or that, having no knowledge of their truth or falsity, he did not believe them to be true; or that, having no knowledge of their truth or falsity, he yet represented them to be true of his own knowledge.

\* \* \* \* \*

"\* \* \* It is not necessary that the statement be recklessly or carelessly made. It makes no difference how it is made if it is made as an affirmation of which defendant has knowledge and it is in fact untrue. The right of recovery \* \* \* is based on the fact that such statement, being untrue in fact, relied upon by the other party in entering into the transaction, has resulted in the loss to him which he should not be required to bear."

Applying the foregoing principles of law to the facts in this case, we have no difficulty in concluding that there was sufficient evidence for the jury to find that the plaintiffs were induced to enter the contract through the fraudulent representations of the defendants. It seems clear to us that the representations made by the defendants go beyond

"puffing" or "dealer's talk." The issue must be viewed against the relationship of the parties. Here the parties were not "on an equality." Defendants had superior knowledge, or an opportunity for knowledge, of the problems which might be encountered in the conduct of the business. Because of their ignorance and inexperience in regard to matters concerning which material representations were made, plaintiffs had a right to rely upon the superior knowledge of defendants. As Judge Learned Hand said in Vulcan Metals Co. v. Simmons Mfg. Co. (2 Cir.) 248 F. 853, 856:

"* * * When the parties are so situated that the buyer may reasonably rely upon the expression of the seller's opinion, it is no excuse to give a false one. * * * it makes much difference whether the parties stand 'on an equality.' For example, we should treat very differently the expressed opinion of a chemist to a layman about the properties of a composition from the same opinion between chemist and chemist, when the buyer had full opportunity to examine."[1]

On the basis of the record we are satisfied that the defendants' overall assurance as to profits substantially constitutes a misrepresentation of fact. It is unnecessary for us to further discuss the affirmations contained in the brochure. To say that they are highly colored and overly optimistic would be an understatement. The unqualified statements of defendants' agent that there was no disease problem represented an affirmation as to his knowledge. The jury could find, whether or not this statement was made with intent to deceive, that it induced reliance to plaintiffs' damage.

It is next contended by defendants that it was error for the trial court to permit other growers who signed contracts with defendants under the same program to testify as to their experiences. Defendants contend that while evidence of similar fraudulent representations is permitted under some circumstances, there are limitations on the use of such evidence, the most important of which is, to quote from their brief, "that it must be clearly demonstrated as a condition to admissi-

[1]See, also, Judge Hand's statement in United States v. Rowe (2 Cir.) 56 F. (2d) 747, 749.

bility that the representations made to other parties which are offered in evidence were, in fact, fraudulent." It is true that opinions of this court indicate that the proper function of such evidence is to show intent. Terzian v. Carlson, 176 Minn. 219, 222 N. W. 921; State v. Jansen, 207 Minn. 250, 290 N. W. 557; Hinkley v. Freick, 112 Minn. 239, 127 N. W. 940.

The trial court in its memorandum expressed the view that "[w]hile it is true that an intent to deceive, in the sense of an evil motive, or deliberate design to cause loss, or consciousness of the falsity of the representation, is not required in an action for deceit, Swanson v. Domning, 251 Minn. 110, 86 N. W. 2d 716, Schlecter v. Felton, 134 Minn. 143, 158 N. W. 813, Bullitt v. Farrar, 42 Minn. 8, the existence of what is called 'fraudulent intent', in a wider sense, is material." We agree with the trial court. The term "fraudulent intent" is used in a highly technical sense, quite different from its ordinary, literal meaning.[2] The evidence was admissible here to show that the affirmations made by defendants' agents were not inadvertent or casual misstatements. We have held that where fraud and deception are in issue, the evidence must necessarily take a wide range, and collateral facts are admissible if they have a logical tendency to throw light on the issue. Annis v. Annis, 250 Minn. 256, 84 N. W. (2d) 256; Watson v. Gardner, 183 Minn. 233, 236 N. W. 213.[3]

---

[2]8A Dunnell, Dig. (3 ed.) § 3819.

[3]We are indebted to the trial court for a helpful memorandum covering the determinative issues in a long and complicated case consisting of approximately 1,800 pages of printed record. In his memorandum discussing the admissibility of this evidence, the trial court said, in part:

"* * * Defendants argue that intent is not an ingredient of the tort so that the occasion for permitting proof of similar facts is absent. And yet defendants admit, in their written argument, that,

" 'the issue in the Hollerman case was * * * whether the representations which they had made were in fact fraudulent.'

"Resolution of that issue depended, in part, upon whether defendants knowingly affirmed as true, of their own knowledge, facts of which they did not have knowledge, and whether they intended that such affirmations induce action on the part of plaintiffs. Those questions make their intent material. While it is true that an intent to deceive, in the sense of an evil

■ Defendants contend that the damages are excessive. If the evidence bearing on this issue is not as clear and satisfactory as it might be, that fault does not lie with the trial court. Without going into a detailed recitation of all of the evidence bearing on the subject of damages, it may be said that from an audit of the figures as they appear in the record, plaintiffs, in carrying out their part of the contract, expended cash in the sum of $23,931.02. In addition, they incurred

---

motive, or deliberate design to cause loss, or consciousness of the falsity of the representation, is not required in an action for deceit, Swanson v. Domning, 251 Minn. 110, 86 N. W. 2d 716, Schlecter v. Felton, 134 Minn. 143, 158 N. W. 813, Bullitt v. Farrar, 42 Minn. 8, the existence of what is called 'fraudulent intent', in a wider sense, is material. It may be shown that the actor represented the facts to be true of his own knowledge, Swanson v. Domning, supra, and it must appear that the actor intended to induce action by another in reliance. Bryant v. Rand, 178 Minn. 375, 227 N. W. 214.

"Upon the question of whether defendants did represent facts to plaintiffs as being true of their own knowledge, and the question whether defendants intended to be taken seriously and to induce action in reliance upon the representations, evidence that defendants made identical representations to other growers who entered upon the same program, had probative value.

"No specific rule excludes evidence of similar facts. It is a question of relevancy weighed with such matters as unfair surprise, confusion of issues, or undue prejudice. This testimony did not unfairly surprise defendants; they knew about it by pre-trial discovery, and by their dealings with the other growers, and by plaintiffs' opening statement. Nor did the testimony confuse any of the issues on trial, or prejudice defendants beyond the inevitable effect of evidence which may tend to prove an issue which is denied. The evidence concerned a pattern of conduct in connection with the time-and-a-half program which professedly was to be carried out by defendants and a number of growers within a certain radius of Willmar, operating under identical standards of chicks, feed, barn and equipment.

"The representations, to the other growers, that disease would be no problem because it would be detected and controlled, was admissible as necessary foundation for the evidence that when disease did occur, Peavey was unable to handle it as had been represented. Thus, both as evidence of intent, and as predicate for other relevant evidence, the testimony was admissible."

debts in the sum of $36,396.13. There was testimony from which it could be found that labor in the reasonable value of $5,929 was expended on the project, making a total of $66,256.15. From this is to be deducted receipts from produce sold of $9,328.79, making a total amount of damage claimed in the sum of $56,927.36. They had a verdict for $40,584.

The particular complaint of defendants is that the verdict may include elements of damage which are not authorized by law. They refer to carrying charges on the purchase contract, various capital expenditures, and the value of the building and machinery which plaintiffs retain on their property. From the record it appears that plaintiffs contended that the building had no value. The testimony of defendants was that it had a value of $21,000. We do not find in the record specific claims as to value of machinery and equipment at the time the contract was terminated. We are inclined to agree with the trial court, however, that there was sufficient evidence as to the character and condition of the machinery and equipment from which the jury could fairly appraise its value to the plaintiffs. Since the amount of the verdict is substantially less than the amount of damages established by plaintiffs, it may be assumed that the jury did, in fact, make allowance for the value of property retained by plaintiffs.

The claim that improper items of damages are included in the verdict might have some merit if the record were in a different posture. Both parties were satisfied to have the issue of damages submitted under the broad rule which permits recovery for the natural and proximate loss sustained by the defrauded party. They were also satisfied to have the jury consider the numerous items of damage in the aggregate. We may assume that the jury made allowance for the actual value of property received and retained by plaintiffs, since the verdict was approximately $17,000 less than the amount which the evidence tended to establish.

At any rate, it is not necessary for us to consider the points raised with reference to items of damage relating to carrying charges, capital expenditures, etc., since that question is raised for the first time on appeal and was not litigated or passed upon by the court below. In re

Improvement of County Ditch No. 1, Yellow Medicine County, 241 Minn. 6, 62 N. W. (2d) 80; Rule 51, Rules of Civil Procedure.

The motion for a new trial does, however, assert that the court erred in denying an instruction to the effect that there was no evidence to support an award for damages "with respect to the equipment." But it appears that this point was not timely raised, and in the context of the record it is tentative at best. In denying the original motion upon which this error is predicated, the trial court made this observation:

"The Court: The Court feels that this motion being made for the first time after the evidence is closed and after two arguments have been given, so that it would be impossible to permit any reopening of the evidence, it being a matter that could have been brought to the attention of the Court prior to the commencement of argument, it also appearing that there is evidence in the record as to the kind of equipment purchased from James Manufacturing Company and its use, and there being evidence as to the type of building in which it is located and some evidence as to the purposes to which that building could be devoted, that there is some evidence from which the jury could find its actual value within the out of pocket fraud test. The jury will be instructed that plaintiff has the burden of proving his damages, and each item of damages claimed, by a fair preponderance of the evidence.

"The motion for a specific instruction with regard to the equipment, or its cost as an item of damage, is denied."

It is important to note that the trial court sought the views of defendants' counsel with reference to instructions bearing on the issue of damages as developed from the facts contained in the evidence. Before instructing the jury, the trial court told counsel:

"The Court: I want the record to also show that maybe three or four days ago I tried to make available to each counsel a summary of what my notes showed as to all claimed expenditures by the plaintiff, and I invited any correction or omissions or protestations that they were not appropriate. Now it isn't too late if anybody wants to present

some requested instructions that will bring the question precisely to the Court's attention. So far no one has requested any requested instruction relating to what may be considered as damages and what may not be. * * *

*   *   *   *   *

"* * * [T]he jury will be instructed in what I think is the accurate way that they will approach the question of damages, which will require them to find that any item of damage must be a natural and proximate result of the fraud, and that with regard to the out of pocket rule, they must find the actual value of what plaintiffs parted with and from that subtract, if there is a difference, the actual value of what the plaintiffs received."

We find in the record no exceptions to the instructions or requests on the points we are now asked to review. The trial court correctly instructed the jury in accordance with the principles of law stated in Wallace v. Hallowell, 56 Minn. 501, 506, 508, 58 N. W. 292, 293, 294, where it was said:

"* * * In accordance with the cardinal principle that compensation should be commensurate with the loss, the rule is, and always has been, that in actions of deceit, or for fraudulent representations, the damages recoverable are all those which naturally and proximately result from the fraud. * * *

*   *   *   *   *

"* * * in some of the cases it is said that the measure of damages is the difference in values of what the party was induced to part with and of what he got by the purchase. As applied to the facts of those cases, this was correct, but it would not do to adopt this as a rule of universal application, for the reason that under some circumstances it might exclude certain elements of damage naturally and proximately resulting from the fraud."

In its memorandum attached to the order denying defendants' motion for a new trial, the trial court made the following statement:

"Defendants contend that the damages were not proven. This pre-

sents a simple question which may be disposed of briefly. Since defendants say,

" 'At the outset, it should be understood that defendants do not challenge the correctness of the Court's instructions but submit that the instructions were entirely proper and in keeping with the settled law of this state relating to the measure of damages recoverable in an action predicated upon fraud and misrepresentation. Furthermore, the defendants do not assert that the Court erroneously received evidence relative to the issue of plaintiffs' damages', the only question of law presented is whether there is any evidence on which the jury could award $40,584 under the proper measure of damages. By one view of the evidence, under a substantial application of the out-of-pocket rule to the facts shown by the evidence, the difference between what plaintiffs parted with and what they received was a loss in excess of $50,000. There was sufficient evidence concerning the Clinton building, and the equipment therein, and the expense of preparing the building for use, and the circumstances under which losses on the second and third flocks occurred, and the labor, for the jury to determine what plaintiffs had received, and what they had parted with, as a proximate result of the representations. Defendants' arguments to the contrary are fact disputes which were for the jury."

The jury was instructed in accordance with the theory on which the case was tried. In reviewing this record one cannot escape the conclusion that all through the trial the court had a sure grasp of the issues and a correct understanding of the applicable law. Nor can one review the record and escape the conclusion that able counsel on both sides recognized this fact. They were satisfied to have the trial court instruct the jury on the issue of damages without suggestions from them as to "what may be considered as damages and what may not be." Under the circumstances, we do not feel that we would be warranted in granting a remittitur or a new trial.

Affirmed.