## ROBERT E. KENNEDY v. FLO-TRONICS, INC., AND ANOTHER.

143 N. W. (2d) 827.

June 24, 1966—No. 39,994.

*Wheeler & Fredrikson, William B. McCallum,* and *Lawrence Perlman,* for appellants.

*Ryan, Ryan & Ebert* and *C. A. Ryan,* for respondent.

OTIS, JUSTICE.

This is an appeal from a judgment against defendants for $15,000 arising out of alleged misrepresentations made to plaintiff concerning the future value of corporate stock.

The contract out of which this litigation arose was entered February 23, 1961. By its terms plaintiff transferred to defendant Flo-Tronics, Inc., all of the assets in a business he was conducting under the name of Kenco Plastics, in return for which plaintiff received 4,000 shares of stock in Flo-Tronics, having a market value of $8.50 per share. Under the contract, plaintiff was obliged to retire the debts he then owed. To that end

the stock he received was pledged with a bank as collateral for a loan in the sum of $17,500. In addition he executed a second mortgage on his home for $5,000. Plaintiff claims he was induced to enter the contract by the assurances of one of defendants' officers, Earl Nelson, that the value of Flo-Tronics stock would rise from $8.50 per share to $25 a share by January 1, 1962. The stock did increase in market value to $17 per share by April 18, 1961. However, plaintiff was advised that under S.E.C. regulations he was not permitted to sell it until he had retained it for 6 months. By March 1962 the market value had fallen to approximately $3 a share. At that time the bank sold the stock for the sum of $10,367.65. In addition the second mortgage on plaintiff's home was foreclosed.

The court charged the jury that in order to recover, plaintiff had the burden of proving (1) that defendants made a false representation of a material fact; (2) that Nelson stood in a relation of trust and confidence to plaintiff which justified his relying on Nelson's opinion regarding the future value of Flo-Tronics stock; and (3) that plaintiff had reasonable cause to believe that Nelson would act only in plaintiff's best interests. In a well-considered memorandum accompanying his order denying a new trial, the court made the following observations:

"* * * It seems to me that there is a sound basis for distinguishing between a promise to do an act in the future and an opinion. With respect to the latter, I view the decisions as showing a disposition on the part of the courts to treat as representations of existing facts those opinions which are expressed as unqualified affirmations by a person in a position to have knowledge of the facts necessary to make such affirmation. * * * Thus, in the present case where the jury has found a confidential relationship to have existed as between plaintiff and Nelson, and the latter, by reason of his dealings and position with defendants, might reasonably be expected to know the facts upon which he based his unqualified affirmation of value, no reason is perceived in law or in reason for not according to such affirmation the legal status of a misrepresentation of fact. As such, the misrepresentation was actionable irrespective of the defendants' knowledge of its falsity."

Since it is the general rule that, in the absence of an intent to deceive, an innocent misrepresentation of future value does not give rise to an action for fraud unless there is such a disparity in the positions of the parties that the law infers an overreaching, the disposition of the instant case hinges on the relationship of the parties and the sequence of events which gave rise to the litigation.[1]

Plaintiff Kennedy and Earl Nelson met in 1954 at Camp McCoy. Nelson, then 45, was a colonel, and Kennedy, then 33, a private, acting as Nelson's radio operator. Kennedy had attended a junior college in Iowa, as well as Oklahoma A. and M., and had earned 187 credits towards graduation. He studied mathematics, science, physics, and aerodynamics, and subsequently attended a radio school in Kansas City. In addition, he took extension courses at the University of Minnesota. He was successively a radio operator for Northwest Airlines, in the United States Air Force, and, having received the highest marks in a competitive examination, postmaster for 5 years at the Ah-Gwah-Ching Sanitarium. He operated various sport shops, and in 1954 commenced a plastics business in the basement of his home at Walker, Minnesota.

Nelson's educational background included 160 college credits and a correspondence course in accounting. He was president of defendant Wilcox Products Company, also dealing in plastics. As a result of Kennedy's acquaintance with Nelson in the Army, Kennedy got in touch with Nelson and began doing business with him in the fall of 1954. Their relationship continued on a friendly basis for the next 6 years, during which time they contracted with one another in business and occasionally vis-

---

[1] "As a general rule, in order to constitute actionable fraud, a false representation must relate to a matter of fact which either exists in the present or has existed in the past. It must also relate to a fact which is susceptible of knowledge; otherwise, there is nothing in relation to which the person making it could state what he knew to be untrue.

"The principle is fundamental that fraud cannot be predicated upon what amounts to, as a matter of law, or in factual cases is found by the triers of the facts to be, the mere expression of an opinion, which is understood by the representee to be only such or cannot reasonably be understood to be anything else." 23 Am. Jur., Fraud and Deceit, § 27.

ited one another's home. In the summer of 1960, Nelson proposed that Kennedy merge his business with Flo-Tronics, which meanwhile had purchased the Wilcox stock from Nelson and others. Nelson had become a vice president of Flo-Tronics, although not on its board, and held approximately 23,000 shares of its stock. He remained president of Wilcox and later became the comptroller and treasurer of Thermotech Industries, a wholly owned subsidiary of Flo-Tronics to which Wilcox was sold. At that time Kennedy was not interested in a merger and declined to consider the proposition when it was broached again by Nelson that fall. However, in December 1960, Kennedy's business had expanded to a point where he had moved it out of his home and it had 13 employees. While his volume had risen to about $35,000 a year, he found he was operating without sufficient capital because of a great many accounts receivable. He was therefore receptive to Nelson's proposal to merge and began negotiations in December 1960 which culminated in the contract of February 23, 1961, under which he transferred assets valued at approximately $28,000 for stock worth approximately $34,000.

Although Nelson had initially proposed that Kennedy receive stock valued at $60,000 to $70,000, after appraising Kennedy's business the offer was reduced to 4,000 shares then priced at $8. Kennedy testified, however, that Nelson assured him the stock would be worth $100,000 by January 1, 1962. The representations which Kennedy claims Nelson made were in substance as follows: Flo-Tronics was one of the growing, faster-moving stocks on the market; it was a diversified business; Nelson himself had made $80,000 on the stock; in his opinion and in the opinion of others in the company, the stock would be worth $25 a share by January 1, 1962; the merger would not only provide the capital Kennedy needed but would assure him financial security and an education for his children; and that no gamble was involved. Nelson acknowledged that the Kennedys stated they did not want to gamble, but testified he told them he felt the stock was a very good gamble.

Kennedy conceded that in their discussions of the future value of the stock one of the other vice presidents of Flo-Tronics did not commit himself and Nelson did not *guarantee* that the stock would be worth $25

a share or represent that it had ever been that high.[2] Kennedy was aware of the fact that the values of stocks fluctuate, and while he owned no stock and initially denied any familiarity with the stock market, he subsequently admitted that he had on various occasions discussed investment funds with an accountant in the Wilcox office prior to his contract with Flo-Tronics and "[o]n one or two occasions" followed the stock market in the Wall Street Journal. Kennedy conceded that Nelson gave his opinion concerning the future value of Flo-Tronics on only one occasion and that he advanced no reason for the prediction except that it was based on the opinion of others in the company.

In justifying his reliance on Nelson's opinion because of a disparity in their relationship, plaintiff cites Stark v. Equitable Life Assur. Society, 205 Minn. 138, 285 N. W. 466. There plaintiff sued on an insurance policy and alleged that he had permitted it to lapse in reliance on the representations of the company's agent that he had no claim. This court sustained an order overruling a demurrer, pointing out that the plaintiff there was "naive and illiterate" and citing with approval the following rule (205 Minn. 145, 285 N. W. 470):

"A fiduciary relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other; and the relation and duties involved in it need not be legal, but may be moral, social, domestic, or merely personal." [3]

We went on to say, however, that a fiduciary relationship is not established simply by a long acquaintance between the agent and plaintiff and the faith and confidence the plaintiff had in the agent, since plaintiff should have known the agent was representing adverse interests.

Cases relied on by plaintiff involve a conscious misrepresentation of facts which were clearly susceptible of knowledge [4] or unconscionable

---

[2] Minn. St. 1961, § 512.12, (incorporated into the Commercial Code, L. 1965, c. 811, as § 336.2-313[2]) provides in part: "* * * No affirmation of the value of the goods, nor any statement purporting to be a statement of the seller's opinion only shall be construed as a warranty."

[3] 23 Am. Jur., Fraud and Deceit, § 14, notes 13 and 16.

[4] Vilett v. Moler, 82 Minn. 12, 84 N. W. 452; Hedin v. Minneapolis M. & S. Institute, 62 Minn. 146, 64 N. W. 158, 35 A. L. R. 417.

overreaching with respect to the young, the gullible and inexperienced, or the simple and unwary.[5] No Minnesota case has been called to our attention which affirms a finding of fraud and deceit where the prophecy or prediction of future value or profits is made in good faith and without a misrepresentation of fact.[6]

A recent decision of this court on which plaintiff relies is Hollerman v. F. H. Peavey & Co. 269 Minn. 221, 130 N. W. (2d) 534. We there affirmed a judgment awarding damages against a vendor of poultry feed for misrepresenting future profits. The losses sustained by the growers were occasioned by airsacculitis which decimated the flock. In referring to a brochure which guaranteed a profit, we stated (269 Minn. 226, 130 N. W. [2d] 539):

*"If it is doubtful that the representations of the brochure amount to more than expressions of opinion or estimates,* it must be conceded that the affirmations of Peavey's representative to plaintiffs on the disease of chicks are material." (Italics supplied.)

We then held that a vendor's assurance that disease was a minor problem and need not give the producers any concern was a material misrepresentation of fact. In arriving at our decision, we observed (269 Minn. 227, 130 N. W. [2d] 539):

"* * * It is well established that if a person represents as true material facts *susceptible of knowledge,* to one who relies and acts thereon to his injury, the one making the representations cannot defeat recovery by showing that he did not know his representations were false or that he believed them to be true. * * *

[5] Adan v. Steinbrecher, 116 Minn. 174, 133 N. W. 477; Gable v. Niles Holding Co. 209 Minn. 445, 296 N. W. 525; Spiess v. Brandt, 230 Minn. 246, 41 N. W. (2d) 561, 27 A. L. R. (2d) 1.

[6] In Goess v. Lucinda Shops (2 Cir.) 93 F. (2d) 449, 115 A. L. R. 264, the vendor stated he thought in a year or so the stock would double in value. The court held (93 F. [2d] 451): "* * * The reasonable conclusion is that in fact appellant did, as a matter of law he had to, take such expressions as to value as mere statements of opinion and prophecy and use his own judgment. Such statements will not support an action against the seller, for they do not amount to misrepresentations of existing facts."

\* \* \* \* \*

"\* \* \* Defendants had superior knowledge, or an opportunity for knowledge, of the problems which might be encountered in the conduct of the business. Because of their ignorance and inexperience in regard to matters concerning which material representations were made, plaintiffs had a right to rely upon the superior knowledge of defendants." (Italics supplied.)

Despite Kennedy's testimony that he had the impression Nelson was negotiating on his behalf and in his best interests, we are of the opinion that there is nothing in the record to support that assumption beyond the bald assertion made by plaintiff. There is no evidence that their disparity in age and military rank in 1954 had any bearing on the arm's length negotiations of 1960.[7] Kennedy rejected Nelson's overtures on at least two occasions and only acquiesced in the so-called merger when he found himself overextended and without sufficient capital. There was a striking similarity between the educational and intellectual capacity of the two men. Although Nelson undoubtedly had broader experience, Kennedy had himself shown an unusual aptitude in the business world. Nevertheless, Kennedy insists that when Nelson expressed the opinion Flo-Tronics stock would triple in value within a year Nelson's position in the companies of which he was an officer gave rise to an inference he was speaking from the vantage of one having information not generally available to the public. We do not agree. The fact is that Kennedy received stock which was equivalent in value to the assets he transferred. Nelson did not represent that he had any undisclosed information. He did not suggest, for example, that Flo-Tronics was about to enter a particularly favorable contract for the sale of its products, or that it had discovered a valuable process which would give it an advantage in the competitive market, or that it was about to accomplish a profitable merger

---

[7] Shema v. Thorpe Bros. 240 Minn. 459, 467, 62 N. W. (2d) 86, 91; Restatement, Trusts (2d) § 2, comment *b*: "\* \* \* If one person is in a confidential, but not a fiduciary, relation to another, a transaction between them will not be set aside at the instance of one of them unless in fact he placed confidence in the other and the other, by fraud or undue influence or otherwise, abused the confidence placed in him."

with some other concern. Nelson did quite truthfully observe that he had a profit in the stock, although there is a dispute as to whether or not it was merely a paper profit. The rise in market value he anticipated was in fact very shortly realized, if not to the full extent that he predicted.

Situations may well arise where a prognostication of future value or future profits made in good faith and without any misrepresentation as to the factual basis of the opinion will constitute actionable deceit if a true relationship of trust and confidence exists and the disparity between the parties is pronounced.[8] Here, however, the record does not support the finding implicit in the verdict that Kennedy was "simple and unwary" or relied blindly on Nelson's judgment. Clearly, in the instant case the prediction of a spectacular increase in value in such a brief period of time was not a representation of fact which was "susceptible of knowledge" within the meaning of the Hollerman case.

In the light of Kennedy's background, experience, and intelligence, we hold he was not justified in assuming that Nelson was omniscient or infallible in a matter as patently fraught with uncertainty as the state of the securities market at a given date in the future.

Reversed.

---

[8] Annotation, 125 A. L. R. 879, 882.