SOUTHERN MINNESOTA MUNICIPAL POWER AGENCY, Respondent,

v.

CITY OF ST. PETER, Concerned Citizens for Reasonable Electric Rates, intervenor, Appellants.

No. C5–88–1422.

Court of Appeals of Minnesota.

Dec. 27, 1988.

Craig R. Beck, Kristin L. Palmer, Dorsey & Whitney, Rochester, for respondent.

Richard Ihrig, Lindquist & Vennum, Minneapolis, for appellant, City of St. Peter.

Willis M. Gustafson, Paul H. Tanis, Jr., MacKenzie, Gustafson, Lucas & Riley, Ltd., St. Peter, for appellant, Concerned Citizens for Reasonable Electric Rates, intervenor.

Heard, considered and decided by RANDALL, P.J., and FOLEY and BOWEN *, JJ.

## OPINION

RANDALL, Judge.

Southern Minnesota Municipal Power Agency (SMMPA) brought a declaratory judgment action against the City of St. Peter (St. Peter) to determine whether its April 11, 1984, electric power sales contract (contract) was enforceable. St. Peter counterclaimed, seeking to have the contract rescinded on equitable grounds. Concerned Citizens for Reasonable Electric

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

Rates, Inc. (CCRER) intervened (on the side of St. Peter) as a defendant, representing consumers of St. Peter's municipal electricity. The trial court declared the contract to be valid and dismissed all counterclaims. Post-trial motions were denied and judgment was entered for SMMPA, with an amended judgment against St. Peter taxing costs. St. Peter and CCRER appeal from the judgments. We affirm.

## FACTS

St. Peter is a municipality located in southern Minnesota. Unlike some municipalities that own their own generating plants, St. Peter contracts with outside suppliers for electric power. For over 50 years, St. Peter contracted with Northern States Power Company (NSP), a private utility, for its supply of electricity. St. Peter eventually became dissatisfied with NSP. Each year, St. Peter actively contested NSP's proposed rate increases. St. Peter had been dissatisfied with NSP's unwillingness to contract for over 15 years. River Electric Association, an organization formed by southern Minnesota municipalities to which NSP supplied electricity, joined in these challenges.

SMMPA is a municipal power agency incorporated under Minn.Stat. § 453.53 (1976).[1] As such, SMMPA had the capacity to finance and acquire its own electric energy facility. SMMPA initially planned to construct and operate a 300m megawatt base load facility. Under this plan, SMMPA would supply electricity to its members from the new generating plant, existing member-owned generating plants, and outside sources. SMMPA's plan included providing reasonably priced electricity (by economies of scale), economical dispatching, tax-exempt-bond financing, and no dividend payments to stockholders. SMMPA's rates would be only high enough to cover its revenue requirements, and its members would have a voice in determining those rates. If excess revenues were realized in any year, they would be returned to the members.

Desiring to be less dependent on NSP for its supply of electricity, St. Peter joined SMMPA in March 1977 to explore an alternative supplier of electricity. St. Peter's representative to SMMPA, Jim Sandeen, was elected to SMMPA's seven-member board of directors in late 1977 and served until 1983. SMMPA's board of directors was comprised of member municipalities' appointed representatives, who had a variety of backgrounds. Sandeen's background included serving for a number of years as St. Peter's Director of Public Works and Superintendent of St. Peter's electrical department.

While SMMPA's construction plans were being formulated, SMMPA's consulting engineers, the R.W. Beck firm, learned that NSP was interested in having other utilities own part of NSP's proposed 800 megawatt SHERCO 3 facility. SMMPA thereafter initiated negotiations with NSP, resulting in a September 17, 1980, letter of intent between the parties. Under the terms of the letter, SMMPA would purchase at least 300 megawatts of SHERCO 3 if its construction was approved by the State of Minnesota. If NSP could not obtain construction approval, SMMPA would proceed with its initial plan of constructing its own facility.

After entering into the letter of intent with NSP, SMMPA asked its twenty-two member cities to decide by April 1981 whether they would enter into "Power Sales Contracts" with SMMPA. Executed contracts would allow SMMPA to determine how much of SHERCO 3 it would purchase and how many revenue bonds it had to sell to finance the purchase.

To assist its members in reaching a decision on whether to contract, SMMPA provided information through a newsletter, *SMMPA Facts*, and a slide show, "Our Power for Our Future." In these communications, SMMPA commented on the uncertainties of the future energy supply in

1. Minn.Stat. §§ 453.51–.62 (1976) were enacted in response to the shortage of electrical energy and its injurious effect on the growth and prosperity of Minnesota communities. In 1976 the electric energy shortage existed and was expected to increase.

general, and from NSP specifically. These communications also commented on feasibility studies done by SMMPA that showed SMMPA as being the most economical way for municipalities to obtain reliable electric power during the next two decades. SMMPA's intent in these communications was to downplay NSP's capacity and pricing structure in favor of its own. However, SMMPA's intent was not hidden, and was clear to those receiving the communications.

While St. Peter deliberated over whether to contract, it asked SMMPA to provide it with a cost comparison between electricity supplied by SMMPA and electricity supplied by NSP. SMMPA asked the R.W. Beck firm to prepare such a cost comparison. In compiling the requested comparison, R.W. Beck used NSP's historical rate increase performance as the basis for projecting NSP's future costs. As SMMPA did not have any performance history, the R.W. Beck firm developed projected performance data to estimate SMMPA's future costs. Ultimately, Beck compiled three projected cost comparisons for SMMPA—a "low," a "probable," and a "high" comparison. The "low" comparison projected that SMMPA's power costs would be higher than NSP's from 1985 through 1992. The "probable" comparison projected that initially SMMPA's power costs would be higher than NSP's, but by 1990, SMMPA's costs would cross over NSP's and remain lower than NSP's through 1992. Finally, the "high" comparison projected that in 1985 SMMPA's power costs would be lower than NSP's, but in 1986, SMMPA's costs would cross over and become higher than NSP's costs through 1987, and, then, in 1988, SMMPA's costs would again cross over and then remain lower than NSP's costs through 1992. The R.W. Beck firm clearly indicated on each of the comparisons that the figures were projections. Although the R.W. Beck firm provided all three comparisons to SMMPA, SMMPA elected to provide only the "probable" comparison to St. Peter.

The St. Peter City Council discussed and considered from September 1980 to April 1981 the issue of contracting with SMMPA.

Finally, on April 13, 1981, the council met to decide on whether to contract with SMMPA for its supply of municipal electricity. Before voting, the council heard from staff and from proponents and opponents of contracting with SMMPA. The opponents challenged the council's concerns over future availability of energy and challenged the accuracy of SMMPA's cost comparisons. Following public comment, the council voted 6–1 to contract with SMMPA for its municipal supply of electricity. Thereafter, a power supply contract dated as of April 1, 1981, was entered into by St. Peter and SMMPA. The effective date of the contract, however, was delayed until May 1, 1985, to coincide with the then projected commercial operation date of SHERCO 3. The contract by its terms was to be effective for a period of 45 years, terminating in the year 2030.

Before SMMPA began supplying St. Peter's electricity, NSP continued under contract to be St. Peter's supplier. During this interim period of 1982 through 1984, NSP's costs of power increased and were passed on to St. Peter through their contract's fuel adjustment clause. For reasons not contained in the record, St. Peter elected to absorb the increases internally by depleting the city's electric department reserves, rather than passing on the increases to the ultimate consumers by increased rates, as was its routine practice. This decision resulted in St. Peter consumers paying artificially low amounts for their electricity during this period.

In 1985, with the effective date of its contract for SMMPA-supplied electricity approaching, and knowing that SMMPA's initial power costs would be higher than NSP's, St. Peter decided, without benefit of a rate study, to raise retail electricity rates by 37%. (Only a 26% increase was needed to meet St. Peter's actual purchased power costs from SMMPA.) St. Peter's consumers reacted violently to the dramatic increase and council members who had voted for the SMMPA contract were not reelected. The issue of the power contract with SMMPA, and whether area people would be better off if they were back with NSP,

dominated the election, and contributed to a new pro-NSP majority on the council.

The commercial operation date of the SHERCO 3 facility was ultimately delayed until approximately January 1, 1988. Consequently, the new St. Peter City Council requested that the effective date of its contract with SMMPA also be delayed until January 1, 1988, but SMMPA denied their request.

As May 1, 1985, approached, the new council discussed refusing to take power from SMMPA and continuing to purchase power from NSP. NSP, however, informed the council that although it was willing to continue to supply power to St. Peter, it would only do so if SMMPA would consent to NSP's continuance or if the council were to obtain a legal declaration that it had no obligation to purchase power from SMMPA. Thereafter, SMMPA sued St. Peter, seeking a declaration that the contract was enforceable. St. Peter counterclaimed for equitable rescission of the contract, claiming that (1) SMMPA misrepresented the availability of energy, the future costs of energy, and the comparative costs of power, all of which induced St. Peter to contract with SMMPA, (2) the contracting parties had made either a unilateral mistake or a mutual mistake concerning material facts to the contract, and (3) that the SMMPA contract is oppressively burdensome. CCRER's intervention followed. Notwithstanding the lawsuit, because electricity is an essential commodity, St. Peter had no choice but to begin purchasing electricity from SMMPA on May 1, 1985, as the parties had contracted.

The trial court heard extensive evidence from the parties' 36 witnesses and over 300 exhibits during the 22–day trial. After carefully reviewing the events of the trial and the parties' voluminous briefs and stipulations, the trial court rendered 195 detailed findings and 71 specific conclusions of law. The trial court concluded, in a December 23, 1987, order for judgment, that St. Peter and CCRER had failed to prove the essential elements of either a misrepresentation or mistaken action and, thus, were not entitled to equitable re-

scission of the power sales contract. In summary, the court determined that SMMPA's statements were not misrepresentations, but rather were opinions as to future events and were not actionable; the statements were not material to the decision of St. Peter; the statements were expressly qualified; St. Peter did not rely on the statements; St. Peter and CCRER were not damaged by the statements; St. Peter and CCRER did not show that SMMPA or St. Peter misunderstood a factual matter that went to the essence of the contract; and there were no significant disparities in SMMPA's and St. Peter's positions from which to infer overreaching. The trial court dismissed, with prejudice, St. Peter's and CCRER's counterclaims and declared the power sales contract to be valid and binding. Subsequently, the trial court denied St. Peter's and CCRER's post-trial motions. Judgment was entered for SMMPA, as well as an amended judgment taxing costs.

St. Peter and CCRER bring this appeal asking that the trial court's judgment and amended judgment be reversed.

### ISSUE

Did the trial court err by dismissing appellants' claims for equitable rescission of the power sales contract?

### ANALYSIS

#### I.

#### STANDARD OF REVIEW

The granting of equitable relief lies within the sound discretion of the trial court and "[o]nly a clear abuse of that discretion will result in reversal." *Wellens v. Thuening*, 393 N.W.2d 302, 305 (Minn.Ct.App. 1986) quoting *Nadeau v. County of Ramsey*, 277 N.W.2d 520, 524 (Minn.1979). "The findings of a trial court sitting without a jury will not be set aside unless they are clearly erroneous." *Id.* at 304 (citing Minn.R.Civ.P. 52.01). "The burden is on appellant to show that there is no substantial evidence reasonably tending to sustain the trial court's findings." *Id.*

## II.

### RESCISSION

On appeal, appellants claim the trial court erred in denying equitable rescission of the contract. Appellants maintain they are entitled to such relief because there was no meeting of the minds because of undue influence, misrepresentation or mistake. We do not find appellants' arguments persuasive. Appellants' claims are essentially based on hindsight that the future savings may not be as great as they hoped or believed when agreeing to contract with SMMPA.

### A. *Fiduciary Relationship*

Appellants first contend that SMMPA, as a political subdivision of the state charged with the responsibility of providing economical power to its members, had a duty to disclose "complete information" to St. Peter when it was deciding whether to contract with SMMPA. Appellants also contend that there was an "absence of an arms' length relationship" and that "considerable disparity in expertise [existed] between the parties" which induced St. Peter to rely upon SMMPA's projections. We disagree.

The general rule is that "one party to a transaction has no duty to disclose material facts to the other" except "when the parties are in a fiduciary relationship with each other." *Midland National Bank of Minneapolis v. Perranoski*, 299 N.W.2d 404, 413 (Minn.1980). "A fiduciary relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other." *Kennedy v. Flo-Tronics, Inc.*, 274 Minn. 327, 331, 143 N.W. 2d 827, 830 (1966). A fiduciary relationship is not established simply by a long acquaintance between the parties, or by plaintiff merely having faith and confidence in defendant where plaintiff should have known defendant was representing an adverse interest. *Id.*

■ The evidence does not disclose that a fiduciary relationship existed between SMMPA and St. Peter. The trial court correctly found that the evidence demonstrated no more than that SMMPA was a seller of electric power to a willing and knowledgeable buyer. That SMMPA did not place complete trust in St. Peter is evident by the fact that St. Peter consulted its staff personnel, its hired consultant, Springsted, Inc., and the Minnesota Energy Agency, as well as other municipalities. Moreover, St. Peter City Council members knew that the R.W. Beck firm was hired as a consultant to SMMPA, not to St. Peter. Council members knew that R.W. Beck had developed much of the technical data which was presented to them. As a result, the council members testified they accepted the materials provided to them by SMMPA with skepticism.

Although SMMPA was organized to assist its members in obtaining an additional supply of electricity, testimony clearly reveals that St. Peter knew SMMPA's interests were not, and could not be, identical to its own. *See Nguyen v. Control Data Corp.*, 401 N.W.2d 101, 106–07 (Minn.Ct. App.1987) (no fiduciary relationship existed where employer operated a program to assist employees in starting their own businesses, the employer provided the employees with substantial resources and financial and legal advice, and plaintiffs knew at all times that the assistance program employees worked for the employer and, thus, represented interests adverse to plaintiffs' interests).

■ Even if the trial court had found a fiduciary relationship between SMMPA and St. Peter, the evidence does not show that SMMPA breached any fiduciary duty. "A fiduciary's duty must be defined with reference to the experience and intelligence of the person to whom the duty is owed." *Perranoski*, 299 N.W.2d at 413. St. Peter's City Council was comprised of individuals having a variety of backgrounds, including members who had gained a level of expertise in contracting for electric power and in evaluating the costs of electric power during its contractual relationship with NSP. In addition, St. Peter consulted with an expert in the utility field before contracting with SMMPA. In so doing, and in conducting an independent investigation,

St. Peter set out to put itself on an equal footing with the SMMPA Board of Directors and its engineering consultant, R.W. Beck. *See Kennedy,* 274 Minn. at 334, 143 N.W.2d at 831 (record did not support finding that plaintiff was "simple and unwary" or "relied blindly" on defendant's representations as to future events); *Hollerman v. F.H. Peavey & Co.,* 269 Minn. 221, 228–29, 130 N.W.2d 534, 540 (1964) (representations went beyond mere "puffing" because the parties were not "on an equality"; defendants had "superior knowledge" and plaintiffs were "ignoran[t] and inexperience[d] in regard to matters concerning which material representations were made").

Appellants failed to offer any proof that SMMPA should have known of St. Peter's "ignorance." *See Satter v. National Farmers Organization,* 358 N.W.2d 731, 733 (Minn.1984). The council, charged with the administration of city government, cannot be said to have lacked the capacity to understand the importance of its actions in rejecting a 15–year contract with NSP and in executing a legally binding 45–year contract with SMMPA. Substantial evidence indicates that the council carefully considered its constituency and the future uncertainties concerning energy availability and costs. Nothing in the record suggests that SMMPA took advantage of St. Peter's trust or benefitted unjustly at St. Peter's expense. *See Nguyen,* 401 N.W.2d at 106. The trial court properly concluded that SMMPA did not have a fiduciary relationship with St. Peter.

### B. *Misrepresentation*

Appellants next contend that SMMPA made various misrepresentations that induced St. Peter to contract with SMMPA for electrical energy rather than remain with NSP. We affirm the trial court's conclusion that the statements in question did not form a basis for legal relief.

■ The party seeking rescission of a contract based on misrepresentation in the inducement bears the burden of proving by a fair preponderance of the evidence all the elements in its action. *Martin v. Guaran-*tee Reserve Life Insurance Co.,* 279 Minn. 129, 134, 155 N.W.2d 744, 747 (1968). To make out a case of actionable misrepresentation:

1. There must be a representation;
2. That representation must be false;
3. It must * * * [relate to] a past or present fact;
4. That fact must be material;
5. It must be susceptible of knowledge;
6. The representer must know it to be false, or in the alternative, must assert it as of his own knowledge without knowing whether it is true or false;
7. The representer must intend to * * * [induce] the other person * * * to act, or justified * * * [to] ac[t] upon it;
8. That person must be so induced to act or so justified in acting;
9. That person's action must be in reliance [on] the representation;
10. That person must suffer damage;
11. That damage must be attributable to the misrepresentation, that is, the statement must be the proximate cause of the injury.

*Lack Industries, Inc. v. Ralston Purina Co.,* 327 F.2d 266, 275 (8th Cir.1964) (applying Minnesota law) (citation omitted).

The following challenged statements by SMMPA do not meet this test. The trial court properly upheld the contract and dismissed St. Peter's and CCRER's counterclaims with prejudice.

#### 1. *Adequate Supply of Power*

■ Appellants contend that during the seven month period preceding St. Peter's decision to contract with SMMPA, SMMPA misrepresented the need for St. Peter to be assured an adequate supply of power. Appellants contend that while there may have been an energy crisis in the mid to late 1970s, in late 1980 and early 1981, when SMMPA's statements were made, there were actually concerns about excess generating capacity in Minnesota. SMMPA's statements in this regard were only expres-

sions of opinion concerning future events and, thus, are not actionable. *See Berg v. Xerxes–Southdale Office Building Co.,* 290 N.W.2d 612, 615 (Minn.1980).

In early 1980, NSP's future power output was uncertain. NSP's coal burning and nuclear facilities had adverse environmental impacts. NSP's facilities had become too expensive to operate, as a direct result of the energy crisis. That NSP *planned* for excess capacity to meet future growth demands in its design of SHERCO 3 does not evidence concern in 1980 and 1981 of excess *available* generating capacity in Minnesota. NSP's proposed SHERCO 3 facility had not even received approval for its construction by April 13, 1980, when St. Peter voted to contract with SMMPA. In fact, SHERCO 3 did not become operational until January 1, 1988. However, it would have been speculation for SMMPA to have foreseen that the energy crisis would ratchet downward during the late 1980s. In other words, SMMPA's predictions and projections, although with hindsight appear overblown, cannot be interpreted as foolishly unreasonable such that they were actionable at the time they were made.

### 2. *Comparative Costs of Power*

Appellants also contend that SMMPA misrepresented the comparative costs of power between SMMPA and NSP. Specifically, appellants contend the projection that SMMPA's initially higher priced power would, by the fifth year of the contract, become and remain less expensive than NSP's, was "fundamentally flawed." Appellants contend that SMMPA's projection contained erroneous assumptions regarding the operation date of SHERCO 3, interest rates, and debt servicing coverage, and, thus, induced St. Peter to contract with SMMPA in order to save money, rather than remain with NSP.

 Predictions of future values are nonactionable unless they fail to reflect past or present facts. *Id.* "If there is a misrepresentation but the purchaser, instead of relying upon it, makes an independent examination and acts upon the result thereof without regard to the misrepresen-

tations, there is no cause of action." *Rother v. Hiniker,* 208 Minn. 405, 407, 294 N.W. 644, 646 (1940). To be actionable, a misrepresentation should be unqualified. *Swanson v. Domning,* 251 Minn. 110, 114, 86 N.W.2d 716, 720 (1957).

The record discloses that St. Peter understood that the SHERCO 3 facility had to receive state approval before it could be constructed. Thus, SMMPA's projection concerning when the facility would be commercially operational was an opinion concerning a future event and is not actionable.

SMMPA's projected interest rate of 8.25% is also a nonactionable opinion of future value. The same is true with regard to SMMPA's projections concerning debt servicing costs. St. Peter had its staff and consultants conduct their own investigation of SMMPA's cost projections. During that investigation, St. Peter never requested that SMMPA provide it with the components of its cost projections. In fact, at the completion of their investigation, St. Peter's consultants advised St. Peter that the cost comparisons were accurate. Moreover, documentary and testimonial evidence indicates that the cost comparisons were expressly qualified and that council members understood they were *not* guarantees. No council members testified that they were mistaken or misled by SMMPA's cost comparisons. Accordingly, the trial court correctly determined that appellants' claims concerning SMMPA's cost comparisons are not actionable.

### C. *Mistake and Disproportionate Hardship*

Appellants also contend that St. Peter was unilaterally mistaken or mutually mistaken with SMMPA in believing that NSP would be unable to continue to supply it with its power requirements, and in believing that power purchased from SMMPA would become cheaper in the late 1990s. Appellants contend that by 1995 this mistake will cause St. Peter to pay approximately five million dollars more to SMMPA than it would have if NSP had continued supplying its electricity. Since these costs

are passed on to St. Peter consumers, appellants contend that enforcement of the power sales contract will cause an oppressive hardship to fall upon St. Peter's businesses, residents, welfare recipients, disabled persons, and the elderly.

The general rule is that a court may order a contract rescinded "if both parties were mistaken with respect to facts material" to the contract. *Gartner v. Eikill*, 319 N.W.2d 397, 398 (Minn.1982). However, "[r]elief from contractual obligations on grounds of unilateral mistake alone has been granted only when enforcement would impose an oppressive burden on the one seeking rescission, and when rescission would impose no substantial hardship on the one seeking enforcement." *Gethsemane Lutheran Church v. Zacho*, 258 Minn. 438, 445, 104 N.W.2d 645, 649 (1960).

█ As previously noted, there was no testimony by the contracting council members that they made a mistake. The council understood the issues and uncertainties involved and made a decision believed to be in the city's best interests over the long term. The fact that River Electric Association and NSP reached an agreement reducing NSP's municipal customers' rates retroactively to January 1, 1986, and prospectively through 1987 (decreasing the effective rates by approximately 3%) was an unforeseeable future event that SMMPA could not have anticipated when its cost comparisons were prepared. St. Peter received what it contracted for, a guaranteed long-term source of electric supply at a reasonable rate. *See E.E. Atkinson & Co. v. Neisner Bros., Inc.*, 193 Minn. 175, 181, 258 N.W. 151, 154 (1935) (in an action for rescission, the complaining party must not have received substantially that for which it contracted to receive).

█ Any hardship to St. Peter residents results from the city's own rate-setting practices during 1982–1984, not from SMMPA's power cost projections. These increased power rates have not "oppressively burdened" the city nor altered its economic welfare; new businesses have come to St. Peter since May 1, 1985, and others which have suffered economically were already in financial straits before the contract's effective date. There was testimony at trial to the effect that rate increases of up to 44.8% over a five year period (9% per year average) are not necessarily unreasonable.

On the other hand, SMMPA would suffer a demonstrable hardship if the contract were to be rescinded. Rescission would negatively affect its bond ratings and debt servicing. This in turn would prejudice bond holders and other member cities. Moreover, SMMPA has incurred substantial obligations in reliance on the contract with St. Peter. SMMPA purchased the NSP primary substation serving St. Peter's electric system. This purchase was encouraged and approved by St. Peter. The fact that the city has offered to buy back this facility will not restore the status quo at this late date. SMMPA has committed itself to transmission agreements and transmission contracts based on its contract with St. Peter. SMMPA has also purchased a share of SHERCO 3, purchased billing apparatus and other equipment in reliance on the contract. To grant rescission of the contract at this time would pass on an oppressive hardship to SMMPA members and unrelated third parties. Even though CCRER argues that any evidence of hardship to SMMPA is speculative and conjectural, CCRER ignores the fact that it is *not* SMMPA that is seeking rescission of the contract, but St. Peter and CCRER. Thus, as appellants, St. Peter and CCRER bear the burden of proving both oppressive hardship on themselves and of proving "insubstantial" hardship on SMMPA. Appellants have not met their burden. The trial court's findings that the parties did not share a mutual mistake and that appellants did not make a unilateral mistake with an unconscionable result are supported by the record.

## DECISION

Reviewing the record as a whole, St. Peter has not established it is entitled to equitable relief based on undue influence, misrepresentation, or mistake. The trial court did not err by finding the SMMPA–

St. Peter contract valid and binding and in dismissing St. Peter's and CCRER's counterclaims with prejudice.

AFFIRMED.