**MIDLAND NATIONAL BANK OF MINNEAPOLIS, Plaintiff,**

v.

**Ronald PERRANOSKI, et al., Defendants,**

and

**Charles PETERSON, et al., third-party plaintiffs, Appellants,**

v.

**Richard E. LURIE, defendant on counterclaim and third-party defendant, Respondent,**

**Sheldon E. Wert, defendant on counterclaim and third-party defendant, Respondent.**

No. 49385.

Supreme Court of Minnesota.

Sept. 5, 1980.

Rehearing Denied Dec. 30, 1980.

---

Leonard, Street & Deinard, Allen I. Saeks, and Robert Lewis Barrows, Minneapolis, for appellants.

O'Connor & Hannan, Joe A. Walters, and Charles D. Reite, Minneapolis, for Lurie.

Maun, Green, Hayes, Simon, Murray & Johanneson, Jerome B. Simon and Geoffrey P. Jarpe, St. Paul, for Wert.

Heard before ROGOSHESKE, PETERSON, and YETKA, JJ., and considered and decided by the court en banc.

PETERSON, Justice.

Plaintiff Midland National Bank of Minneapolis brought this action against defendants Ronald Perranoski, Howard Cohen, Charles Peterson, Harry Lerner, Robert Schroer, and James Palmer to collect $294,047.28 due on a promissory note made by Stone House Cattle Company, a partnership in which defendants were partners. The answering defendants, as third–party plaintiffs, impleaded third–party defendants Richard Lurie and Sheldon Wert seeking damages for fraud and breach of fiduciary duty. The trial court granted Lurie and Wert's motions for a directed verdict. Third–party plaintiffs now appeal from the judgment.[1]

Richard Lurie is a certified public accountant with special expertise in income tax planning. During the time relevant to this action, Lurie was a partner in the Minneapolis accounting firm of Segal, Sudit, Rochlin, and Lurie. Sheldon Wert is a businessman and banker. He has been involved in real estate, construction, lumber, and cattle–raising enterprises. Lurie and Wert met in the early 1960's, when Wert became a client of Lurie's firm. Since then, they have participated together in several business ventures with "tax shelter" characteristics. Stone House Cattle Company (Stone House) was such a venture.

In 1971, Wert learned that a large ranch in Nebraska was for sale. Wert and Lurie developed a plan for the ranch involving two partnerships: one partnership, Loop Valley Land Company (Loop Valley), would purchase the ranch and the other partnership, Stone House, would own cattle and rent part of the ranch for grazing. The funds necessary to purchase the cattle would be raised by selling partnership interests in Stone House in units of $40,000. The cattle would then be used as collateral to secure loans to cover Stone House's other expenses. The partnership form of organization would make Stone House effective as a tax shelter. Each partner's proportionate share of Stone House's business expenses, including debt service on the loans, and business losses could be used to reduce the amount of his ordinary income from Stone House and other sources. Because Stone House would be a general partnership, each partner would be entitled to deduct losses due to the partnership exceeding the amount of his basis in the partnership.

Third–party plaintiffs purchased partnership interests in Stone House in 1971.[2] Palmer, Lerner, and Peterson learned of Stone House through Lurie; Schroer learned of it through Lee Sudit, one of Lurie's partners in the accounting firm. Third–party plaintiffs paid for their part-

---

1. Appellants, who are defendants and third–party plaintiffs Charles Peterson, Harry Lerner, Robert Schroer, and James Palmer, will be referred to individually by name and collectively as third–party plaintiffs. Defendant Ronald Perranoski made no appearance in this action. Defendant Howard Cohen has not appealed.

2. Palmer purchased a one–half partnership interest for $20,000; Lerner, Peterson, and Schroer each purchased a single partnership interest for $40,000.

nership interests in two installments. After each made his first payment he received a document entitled "Partnership Agreement." The partnership agreement was transmitted to third–party plaintiffs by the attorney who had drafted it, and was accompanied by a letter inviting questions and comments from prospective partners. Third–party plaintiffs each signed the partnership agreement and sent it to Lurie.

The partnership agreement, nine pages in length, provides in part:

## I.

### CREATION OF PARTNERSHIP

The parties hereto have agreed and by these presents do enter into and create a partnership under and pursuant to the provisions of the Uniform Partnership Act, Minnesota Statutes Chapter 323, as amended, and the rights and liabilities of the partners shall be as provided and set forth therein except as herein otherwise expressly provided.

\* \* \* \* \* \*

## VIII.

### APPOINTMENT OF MANAGEMENT COMPANY

By execution of the Management Agreement (a copy of which is annexed hereto and made a part hereof) contemporaneously herewith, the partnership does hereby appoint SHELDON Z. WERT as its representative and manager for all those matters and things provided in said Management Agreement upon the terms and condition—including compensation—therein set forth.

\* \* \* \* \* \*

In the event that the partnership defaults in the payment or performance of any of its obligations and in the event that a claim or demand shall be made against any one or more of the partners for the payment or performance of such a partnership obligation, the partner or partners against whom such claim or demand shall have been made shall give written notice to each of the other partners by registered or certified mail at the addresses herein set forth. In the event the party making the claim or demand shall be legally entitled to payment or performance of the partnership obligation by one or more of the partners and one or more of the partners shall pay or perform such obligations, after having waited five (5) days from the date of giving of notice of the claim or demand to the other partners as aforesaid, then the partner or partners that pay or perform the partnership obligations shall be entitled to contribution from the other partners in the same proportions as their respective contributions to capital of the partnership.

The partnership agreement names as partners nine individuals in addition to third–party plaintiffs and Perranoski and Cohen. One of the individuals named is Lurie. The partnership agreement provides that Lurie's $40,000 partnership interest is in exchange for his "development work for the purpose of acquiring cattle herd or cattle herds by the partnership."

As a tax shelter, Stone House proved successful. For the years 1971 through 1975, inclusive, Lerner, Peterson, and Schroer each realized a total net loss of $95,663. Palmer's net loss for those years was $47,871. As a business, however, Stone House suffered when from early 1974 until early 1975 the market price of cattle dropped dramatically.[3]

Stone House was liquidated in 1975. Its assets upon liquidation were insufficient to satisfy the debt it owed plaintiff. Third–party plaintiffs and Perranoski and Cohen were the only Stone House partners who refused to pay plaintiff their proportionate shares of the debt. When plaintiff commenced this action against third–party plaintiffs and Perranoski and Cohen, third–party plaintiffs impleaded Lurie and Wert.

---

**3.** At a partnership meeting on November 18, 1974, Wert told the partners present that the market price of cattle, which had been 61 cents per pound at Stone House's most recent sale, was currently between 24 cents and 29 cents per pound.

In their third–party complaint they alleged (1) that in attempting to convince them to invest in Stone House Lurie and Wert fraudulently misrepresented both the extent of a Stone House partner's personal liability for debts of the partnership and the risk of loss associated with an investment in the partnership; (2) that Lurie breached a fiduciary duty he owed to each of them by failing to disclose certain facts material to a decision to become a partner in Stone House; and (3) that Wert, as managing agent of the partnership, breached fiduciary duties he owed to the partnership by failing to disclose certain facts relating to the business of the partnership. Third–party plaintiffs sought compensatory damages equal to the amounts they paid for their interests in Stone House plus all amounts they may be required to pay in satisfaction of liabilities of Stone House, including the liability of Stone House to plaintiff. In addition, third–party plaintiffs requested punitive damages of $250,000.

The matter was tried to a jury in May 1978. The trial court bifurcated the issues for purposes of trial, ordering that the claims against Lurie and Wert be tried after the trial of plaintiff's claims. Plaintiff's claims were settled after 1 week of trial, when Palmer, Lerner, Peterson, Schroer, and Cohen agreed to pay plaintiff $294,000.[4] The trial of the claims against Lurie and Wert occupied an additional 2 weeks. At the close of all the evidence, Lurie and Wert separately moved for directed verdicts pursuant to Minn.R.Civ.P. 50.01. By an order dated June 16, 1978, the trial court granted their motions.

■ The issue to be decided on this appeal is whether the trial court erred in directing a verdict in favor of Lurie and Wert. A motion for a directed verdict presents a question of law regarding the sufficiency of the evidence to raise a fact question for the jury's decision. For purposes of the motion, the trial court must consider the record as a whole and treat as credible the evidence for the adverse party and all inferences which may reasonably be drawn from that evidence. The trial court should grant the motion only when it would clearly be its duty to set aside a contrary verdict as manifestly against the evidence or when such a verdict would not comply with the applicable law. *J. N. Sullivan & Associates, Inc. v. F. D. Chapman Construction Co.*, 304 Minn. 334, 336, 231 N.W.2d 87, 89 (1975). The same standard governs this court on review.

To evaluate the sufficiency of the evidence to present questions for the jury regarding third–party plaintiffs' claims, it is necessary to consider the specific circumstances under which each third–party plaintiff came to invest in Stone House.

*James Palmer*

James Palmer is, and at all times relevant to this action was, a baseball pitcher for the Baltimore Orioles. Palmer was 25 years old when he and Lurie became acquainted at a Minneapolis restaurant one evening in the spring of 1971. On the following day, Palmer and Lurie met and discussed various investments, including the Stone House partnership. Palmer testified that Lurie mentioned that "with my income going up and becoming more successful * * * it might be a good idea of maybe going into a cattle deal which was a tax shelter." Palmer had previously made investments in stocks and bonds.

Later in 1971, Palmer and Lurie discussed Stone House in greater detail. According to Palmer, Lurie's description of the investment was that "I would give him $20,000 in two payments and that at the end of the five years, not only would I get the tax write–offs that I would receive during the deal, but I would also receive probably twenty –eight to thirty–four thousand dollars in return." Palmer testified that Lurie told him that the cattle deal "was a good investment * * * along with being a tax shelter." When asked whether the subject of risk to the investment was discussed during the meeting, Palmer said:

4. Palmer, Lerner, Peterson, and Schroer agreed to pay Perranoski's share of the liability in exchange for plaintiff's assigning its cause of action against him to them.

I asked him if I could lose any money, and he said no, he didn't really see any way. We were going to buy the cattle, I think he said at thirty–eight cents a pound and the market value was forty–two cents. And he mentioned at that particular time along with the $20,000 that we may have to borrow some money, and I became concerned over that. I then said, well, you know, "If you have got to borrow money, am I going to be liable for it?" He said, "Don't worry about that because the cattle are always used for the collateral for the money you borrow." So I said, "That sounds good to me," and left it at that.

Palmer received a copy of the Stone House "pro forma statement," a document prepared by Lurie and Wert that set forth financial projections for the partnership. Barry Robinson, Palmer's attorney, reviewed the pro forma statement for Palmer and discussed the investment with Lurie. Robinson told Palmer the pro forma statement's financial projections "looked pretty good." When Palmer received the partnership agreement, Robinson advised him to sign it. Palmer testified that he did so after "brows[ing] through" the partnership agreement. He also stated that he signed the partnership agreement in reliance on Robinson's recommendation.

### Harry Lerner

Harry Lerner operates two businesses, a publishing company and a book binding company. Lerner and Lurie live next door to each other. They had only a "nodding acquaintance" until sometime in the fall of 1971, when they first discussed tax planning. In the course of their conversation, Lurie learned that Lerner was doing nothing to relieve his income tax burden. Lurie asked to review Lerner's tax returns for the past several years, and Lerner allowed him to do so.

Shortly thereafter, Lurie gave Lerner a copy of the Stone House pro forma statement. Lerner looked it over and discussed it with Lurie. Lurie described the pro forma statement's projections as "conservative" and said that "the price of meat was

going up and that this was an extremely safe investment." Lerner had his attorney, Burton Weisberg, review the pro forma statement. In early November 1971, Lerner gave Lurie a check for $25,000 as partial payment for an interest in Stone House. Lerner subsequently received a copy of the Stone House partnership agreement and showed it to Weisberg. On December 30, 1971, Lurie telephoned Lerner and asked him why he had not yet signed and returned the partnership agreement. Lerner told Lurie that he had learned that Stone House was "a general partnership instead of a limited partnership" and that he was "aware that in a general partnership there are obligations beyond your own investment, whereas a limited partnership was restricted to just your investment." Lerner described Lurie's response:

He said they were technicalities, I should sign it, put it away, not to worry, this was a very safe investment, and that he was familiar with my tax situation, and this would bring some tax relief at that point, and that he has had a lot of success in this, and there wasn't anything for me to concern myself about, to sign and send it in.

Lerner asked if his wife could sign the partnership agreement instead of him so that she, who had fewer assets than he did, would be the one liable for partnership debts. Lurie responded that this arrangement would be unacceptable to the bank making loans to Stone House. Lerner then signed the partnership agreement and mailed it to Lurie.

### Charles Peterson

Charles Peterson is a thoracic surgeon. He met Lurie in 1971, when, on the recommendation of friends he called Lurie for investment advice. At the time, Peterson was participating in some limited partnerships for the purpose of sheltering income from taxation and was concerned because with regard to one of the limited partnerships he had been asked to contribute an additional $5,000. Lurie advised Peterson to consult a lawyer on the matter and liquidated the investments for him.

Lurie became Peterson's tax accountant. He called Peterson in the spring or summer of 1971 and suggested Stone House to him as a tax shelter. Peterson testified that he reminded Lurie of his previous difficulties with tax shelters and asked Lurie what was "the worst possible thing" that could happen as a result of an investment in Stone House. He described Lurie's response:

> He said that there was no risk involved. He said that—he said that the most you could lose if we had a major depression—and the words that he used—"If the country went to hell, the most that you could lose is your $40,000, but don't worry about that because the benefits that you would receive from entering into this investment would exceed the losses that you would have if you lost the $40,000."

Peterson received the partnership agreement in the mail, signed it, and returned it to Lurie's office without reading it. Peterson testified that he would not have invested in Stone House if he had known that his liability could exceed the amount of his capital contribution. He also stated that he would have known this if he had read the partnership agreement.

*Robert Schroer*

In 1970, Robert Schroer consulted the accounting firm in which Lurie was a partner for advice in connection with Green Giant Company's purchase of Schroer's garden center business. Schroer dealt with Lee Sudit, one of the partners in the firm. In August or September 1971, Schroer and Sudit discussed methods of sheltering some of Schroer's income from taxation. In September or October 1971, Sudit suggested Stone House to Schroer as a tax shelter investment. Schroer and Sudit did not discuss the subject of risks to the investment. During another meeting, Sudit pointed out to Schroer the projected tax deferments listed on the Stone House pro forma state-

ment. At this time Schroer decided to invest in Stone House. He testified that in making that decision he relied on the statements made to him by Sudit. After Schroer received the partnership agreement, he signed it and sent it to Lurie. He did not read it before he signed it.

▮ To establish either third–party defendant's liability to him for the tort of fraudulent misrepresentation, each third–party plaintiff was required to show (1) that the third–party defendant made to him a false representation of a past or present fact which was material and susceptible of knowledge, (2) that the third–party defendant either knew the representation was false or made it without knowing whether it was true or false, (3) that the third–party plaintiff intended to induce him to act in reliance on the representation, (4) that he was justified in so acting, and (5) that he suffered resulting damage. *Weise v. Red Owl Stores, Inc.*, 286 Minn. 199, 202–03, 175 N.W.2d 184, 187 (1970).[5]

None of the representations Lurie is alleged to have made meets this test. The trial court was therefore correct in directing a verdict for Lurie with respect to third–party plaintiffs' claims against him for fraudulent misrepresentation.

▮ Initially, we can dispose of third–party plaintiffs' contention that Lurie is liable for fraudulent misrepresentation because he represented Stone House as a partnership in which a partner's personal liability for partnership debts was limited to the amount of his capital contribution—or, in other words, as a limited partnership. No third–party plaintiff claims Lurie told him Stone House was a limited partnership. Assuming that certain statements Lurie made regarding the extent of a Stone House partner's liability for partnership debts may be viewed as representations of

**5.** Third–party plaintiff Schroer may maintain an action in fraud against third–party defendant Lurie on the basis of representations made to Schroer by Lurie's partner, Lee Sudit. Partners are jointly and severally liable for any loss of injury caused by the wrongful act of any partner acting in the ordinary course of the partnership business. Minn.Stat. §§ 323.12, 323.14 (1978). The arrangement of tax shelter investments was part of the ordinary business of the accounting firm in which Lurie and Sudit were partners. Lurie is therefore vicariously liable for any loss caused to Schroer by a wrongful act on the part of Sudit.

Stone House as a limited partnership, a jury could not reasonably find that any third-party plaintiff was justified in acting in reliance on such representations.

From Article XV of the partnership agreement it is clear that a partner could be called upon to provide funds in addition to his capital contribution in order to satisfy debts of the partnership. Lerner knew this and clearly did not act in reliance on any representation to the contrary. If either Palmer, Peterson, or Schroer relied on such a representation, his reliance was not justified.

In *Weise v. Red Owl Stores, Inc.*, we held that "where a party makes a representation which a signed document contradicts, the person to whom the representation was made is justified in relying upon it where the document * * * is couched in ambiguous legal language which a layman could reasonably believe supported the representation." 286 Minn. at 203–04, 175 N.W.2d at 187. Furthermore, "[f]raud is proved with reference to the specific intelligence and experience of the aggrieved party rather than a reasonable-man standard." *Murphy v. Country House, Inc.*, 307 Minn. 344, 351, 240 N.W.2d 507, 512 (1976).

Palmer, Peterson and Schroer are educated and literate men.[6] Schroer is a successful businessman. Palmer and Peterson had had investment experience prior to their investments in Stone House. Each was mailed a copy of the partnership agreement and asked for his questions or comments concerning it. Each had ample time to read the partnership agreement before signing it. Although Peterson and Schroer did not read the partnership agreement, and Palmer merely "browsed through" it, they can-

not now be heard to claim they had no knowledge of its contents. The partnership agreement unambiguously discloses that a partner's personal liability for debts of the partnership is not limited to his capital contribution. A jury could not reasonably find that third-party plaintiffs were justified in relying on oral representations contradicting the partnership agreement.

▮ Third-party plaintiffs also allege Lurie is liable for fraudulent misrepresentation because he represented Stone House as a more sound investment than it actually was. Lurie's statements in this regard are expressions of opinion concerning the likely effect of future events on an investment in Stone House, not representations of past or present facts. Although a statement of opinion as to future value does not generally give rise to an action for fraud, such a statement may be actionable if the one making the statement is relied upon for his expertise with respect to the subject of the statement. *Kennedy v. Flo–Tronics, Inc.*, 274 Minn. 327, 329, 143 N.W.2d 827, 828 (1966).[7] Lurie has special expertise in accounting and tax planning; he also held himself out as an investment advisor. He was bound to exercise care in recommending a particular investment, but he cannot have been expected to guarantee its soundness. Third-party plaintiffs were aware that the success of Stone House as a business venture was dependent upon the market price of cattle. In 1971, the market price of cattle was increasing, and the evidence suggests that at that time Stone House was a sound investment.[8] Stone House failed because from early 1974 until early 1975 the market price of cattle fell catastrophically. It would be unreasonable,

---

6. Peterson is a college and medical school graduate. Palmer graduated from high school and has had two semesters of undergraduate study. Schroer is a high school graduate.

7. There is no evidence in the record to suggest that Lurie's statements to Palmer were not innocently made. Moreover, Lurie himself held a partnership interest in Stone House that was subject to the same risks as the interests of third-party plaintiffs.

8. In this connection it should be noted that financial projections such as those contained in the Stone House pro forma statement are actionable in fraud if they do not "accurately reflect surrounding past and present circumstances." *Berg v. Xerxes–Southdale Office Bldg. Co.*, 290 N.W.2d 612, 615 (Minn.1980). In this case there is no evidence to indicate that the pro forma statement, at the time it was prepared, inaccurately reflected past or present circumstances.

in our view, for a jury to find that in 1971 Lurie could have foreseen this occurrence.

Moreover, even if Lurie could have done so, it is unlikely that his failure to apprise third–party plaintiffs of that risk was the proximate cause of their loss. Wert advised the partners to liquidate the partnership at a time when the loss would have been considerably less than the loss that ultimately resulted, but the partners refused to follow his advice.

■ 2. The trial court was also correct in directing a verdict for Wert with respect to third–party plaintiffs' claims against him for fraudulent misrepresentation. Wert made no oral representation to any third–party plaintiff. He did have a part in preparing the pro forma statement, but there is no evidence that the financial projections contained in the pro forma statement inaccurately reflected past or present circumstances. Therefore, it is not actionable. *Berg v. Xerxes–Southdale Office Building Co.*, 290 N.W.2d 612, 615 (Minn.1980).

■ 3. Third–party plaintiffs also argue that Lurie had a duty to disclose to them the material fact that Stone House was not a limited partnership.[9] Although the general rule is that "one party to a transaction has no duty to disclose material facts to the other," and exception to this rule is made when the parties are in a fiduciary relationship with each other. *Klein v. First Edina National Bank*, 293 Minn. 418, 421, 196 N.W.2d 619, 622 (1972). " 'A fiduciary relation exists when confidence is reposed on one side and there is resulting superiority on the other; and the relation and duties in it need not be legal but may be moral, social, domestic, or merely personal.' " *Kennedy v. Flo–Tronics, Inc.*, 274 Minn. at 331, 143 N.W.2d at 830 (quoting *Stark v.*

*Equitable Life Assurance Society*, 205 Minn. 138, 145, 285 N.W. 466, 470 (1939)).

■ We think it clear that a jury could not reasonably find that a fiduciary relationship existed between Lurie and either Palmer or Lerner. The evidence demonstrates that Lurie's role with respect to Lerner and Palmer was that of a salesman selling an investment interest to a willing buyer. That Palmer and Lerner did not place their trust in Lurie is indicated by the fact that each consulted his own attorney with regard to the transaction. Lerner, moreover, admitted that he understood the extent of his liability as a partner in Stone House.

■ The question whether a jury could reasonably find a fiduciary relationship between Lurie and either Peterson or Schroer is a closer one. Assuming, for the sake of argument, that a jury could reasonably find such relationships, it nevertheless could not reasonably find that Lurie breached the duty imposed on him by either relationship. A fiduciary's duty must be defined with reference to the experience and intelligence of the person to whom the duty is owed. Peterson and Schroer are educated individuals who had had experience in business and investment matters prior to their investments in Stone House. They cannot have been unaware of the importance of reading a legally binding document before signing it. The Stone House partnership agreement disclosed the extent of a partner's liability for debts of the partnership, and Lurie was entitled to expect that Peterson and Schroer would read the partnership agreement. He therefore did not breach his duty to disclose the material fact that Stone House was not a limited partnership.[10]

---

**9.** Third–party plaintiffs also argue that Lurie had a duty to disclose to them the specific risks inherent in a cattle–breeding operation (*e. g.*, the risk of disease). The evidence suggests that such risks were insignificant and immaterial to third–party plaintiffs' decisions to invest in Stone House. Similarly, the fact that Wert was a partner in Loop Valley Land Co. was, we believe, immaterial to third–party plaintiffs' decisions.

**10.** As a partner in Stone House, Lurie owed a fiduciary duty to his co–partners. 14B Dunnell Digest, *Partnerships* § 7374 (1974). Although third–party plaintiffs make claims based on this relationship on appeal, no such claims were made in the pleadings or at trial.

Our conclusion that the trial court was correct in directing a verdict for Lurie removes from this case the question of Wert's vicarious liability for Lurie's torts. Therefore, we need

4. As the managing agent of Stone House, Wert owed the partnership a fiduciary duty. Third–party plaintiffs allege that Wert breached this duty by failing to keep them informed of Stone House's deteriorating financial condition. The trial court concluded that Wert discharged his duty to the partnership by keeping Lurie informed of his activities in managing the partnership business. We agree with the trial court's conclusion.

Minn.Stat. § 323.11 (1978) provides:

Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner.

There is no evidence in the record to suggest that Lurie and Wert were attempting to defraud Stone House during the period of its existence. There is ample evidence demonstrating that Wert kept Lurie fully informed of his activities in managing Stone House. Moreover, other partners not parties to this lawsuit were present at partnership meetings at which Wert described the status of the partnership business. At least Palmer, Lerner, and Peterson periodically received letters inviting them to attend these meetings. At a meeting in 1974, Wert recommended liquidation of the partnership. If his recommendation had been followed at that time, the partnership deficit would have been substantially less than it was when liquidation finally took place.

The judgment of the trial court is affirmed.

TODD, J., took no part in the consideration or decision of this case.

AMDAHL, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

not reach the question whether there was evidence from which a jury could reasonably have found that Lurie and Wert were engaged in a joint venture.