NORWEST BANK HASTINGS, f/k/a
Northwestern National Bank of
Hastings, Respondent,

v.

Edward D. CLAPP, Appellant.

No. C8–86–82.

Court of Appeals of Minnesota.

Oct. 7, 1986.

Steven Schroer, James Wine, Faegre &
Benson, Minneapolis, for respondent.

William C. Mortenson, Minneapolis, for
appellant.

Heard, considered, and decided by LES-
LIE, P.J., and WOZNIAK and CRIPPEN,
JJ.

## OPINION

WOZNIAK, Judge.

Respondent Norwest Bank Hastings
commenced this action in November of
1980 after appellant Edward Clapp default-
ed on a note in the amount of $99,000.
Clapp signed the $99,000 note in an effort
to provide working capital for Autocraft,
Inc., a company in which he was a director
and major stockholder. Clapp did not dis-
pute that he signed the note, but argued
that Norwest defrauded him. The trial
court held that Clapp failed to prove his
defenses as a matter of law. We affirm.

## FACTS

Autocraft, Inc. was incorporated on
March 28, 1977, and manufactured truck
utility bodies used by telephone and utility
company service crews. Autocraft was
owned and controlled by its president,
David Fuller. In early 1979, Fuller was
soliciting investors for his fledgling compa-
ny. One potential investor was Floyd Pe-
terson, a mutual acquaintance of Fuller
and Clapp. Fuller told Peterson capital
invested in Autocraft would go toward re-
ducing Autocraft's outstanding loans and
Peterson made a small investment in the
company. Peterson was reluctant to invest
further unless Clapp also was interested in
investing. Peterson arranged a luncheon
attended by Fuller, Peterson, Clapp, and

Richard Pike, the president of respondent Norwest Bank Hastings. At this luncheon, Peterson and Fuller attempted to persuade Clapp to invest.

Clapp was a very sophisticated investor. He made a preliminary investigation and intended to hire an accounting firm later to check the financial status of the company. Following his preliminary investigation, he knew Autocraft had never shown a profit and that his investment was speculative. Nevertheless, on April 19, 1979, Clapp acquired 70,000 Autocraft shares from the company at $1.00 per share. On April 27, 1979, he purchased an additional 60,000 shares from another corporate insider at $1.50 per share. Within a month, Clapp had been elected to the Autocraft Board of Directors and was Autocraft's third largest investor.

Clapp took an active role in the financial management of Autocraft. In the spring and early summer of 1979, he executed various personal guarantees exceeding $250,000 on other Autocraft loans. As of early summer 1979, he had $410,000 of his own funds invested in Autocraft or guaranteed to its lenders.

One of Autocraft's principal lenders was Norwest Bank Hastings. Pike was principally accountable for the Autocraft loans and was involved in Autocraft's daily business operations. Pike spent thirty to forty percent of his time servicing commercial loans, a majority of which involved Autocraft, its principals, or its parent company, Falcon.

In early 1979, Norwest, through Pike, had extended credit to Autocraft, Falcon, and several principal investors for $667,-930. The legal lending limits were $450,-000. About this time, Pike received a letter from Norwest's parent corporation, Banco, informing him that the Falcon file would be reviewed in the future. Pike told Fuller the Falcon-Autocraft outstanding loans should be reduced.

Throughout the spring and summer of 1979, Clapp assisted in preparing the $650,-000 private placement of Autocraft securities. The private placement would have offered Autocraft shares to the public at $1.80 per share. Clapp assisted in drafting a memorandum explaining the private placement, which contained extensive disclaimers warning potential investors of Autocraft's negative net worth, deficit working capital, and delinquent status in paying lenders, suppliers, its lessor, and federal and state payroll taxes. The memorandum also stated that Autocraft would use the private placement proceeds for payment of "current and overdue liabilities." The memorandum advised of Autocraft's generally precarious financial situation and the extreme risk of investing in Autocraft.

In late summer, Fuller persuaded Clapp to infuse more working capital into Autocraft and arranged Clapp's purchase of 100,000 shares of Autocraft nontradeable legend stock at $1.00 per share. Norwest, through Pike, agreed to extend unsecured credit to Clapp to finance this purchase.

On September 5, 1979, Clapp went to Norwest to meet with Pike and arrange financing for the purchase of the legend stock. He met with Pike for approximately ten minutes. Pike told him that the "loan is a good deal for you and Autocraft." Pike said the loan would be in the amount of $99,000 instead of $100,000 because loans of $100,000 had to be approved by a loan committee. Pike did not state that a portion of the loan would pay off Autocraft's notes held by Norwest in excess of the legal lending limit.

While at Norwest, Clapp signed a $99,-000 note and endorsed a $99,000 cashier's check to Fuller, and Fuller endorsed the check. Pike deposited the check into a new account opened for Fuller that day. Fuller immediately deposited approximately $25,-000 from the newly-opened account to Autocraft's account. Fuller also immediately paid Norwest $47,000 for interest and principal payments owed by Autocraft to help cure the lending limit problem.

Fuller never delivered the Autocraft stock to Clapp. Nevertheless, Clapp renewed his note and paid interest then due to Norwest on November 30, 1979, and

again on February 19, 1980. He made no complaint about the transactions at the time of either renewal and continued his involvement in Autocraft management.

In May or June 1980, Autocraft folded. The private placement never took place.

Norwest commenced this action in November 1980 after Clapp defaulted on his note obligations. He did not dispute that Norwest loaned him $99,000 or that he defaulted on the note. Norwest moved for summary judgment, but the trial court initially denied the motion pending completion of discovery. When Norwest brought its second summary judgment motion, the trial court denied it, but granted Clapp's request to amend his answer and counterclaim to allege fraud.

Shortly thereafter on February 12, 1982, Clapp filed a petition for Chapter 11 bankruptcy in the United States Bankruptcy Court, District of Minnesota. The filing stayed any action on the note collection until January 3, 1985—the date the bankruptcy court lifted the stay. After the stay was lifted and discovery complete, the matter was set for trial.

After opening arguments, the trial court granted summary judgment in favor of Norwest in the amount of $173,844, representing the principal and interest on the $99,000 note, holding that Clapp's defenses of common law fraud and securities fraud failed as a matter of law.

## ISSUES

1. Did the trial court err in holding that Clapp's securities fraud claim failed as a matter of law?

2. Did the trial court err in holding that Clapp's common law fraud claim failed as a matter of law?

## ANALYSIS

1. In defense against the note collection, Clapp argued that Norwest aided and abetted in securities fraud. The Minnesota Securities Act provides for this type of secondary liability.

Every person who directly or indirectly controls a person liable under subdivision 1 or 2 [for securities fraud], every partner, principal executive officer or director of such person, every person occupying a similar status or performing a similar function, every employee of such person who materially aids in the act or transaction constituting the violation, and every broker-dealer or *agent who materially aids in the act or transaction constituting the violation,* are also liable jointly and severally with and to the same extent as such person.

Minn.Stat. § 80A.23, subd. 3 (1984) (emphasis added).

■ This section allows for the secondary liability of agents or control people for securities fraud. However, Norwest does not fit within the statutory definition of an agent. The Securities Act defines an agent as "any individual other than a broker-dealer who *represents* a broker-dealer or issuer in effecting or attempting to effect purchases or sales of securities." *Id.* § 80A.14, subd. 3 (emphasis added).

Clapp alleges that Peterson and Fuller solicited him to invest in Autocraft and that Fuller arranged Norwest financing for one stock purchase. Clapp agreed to buy the stock from Fuller and worked out the agreement terms with Fuller before going to the bank for financing of the purchase. Only Peterson and Fuller effected the sale of securities to him and neither Peterson nor Fuller were Norwest employees. Under the facts as Clapp alleges them, Norwest did not represent Autocraft or Fuller in any transaction nor did it effect or attempt to effect any stock sales. Hence, Norwest fails to fit within the definition of agent necessary to establish secondary liability under the statute.

Moreover, the commissioner's comment to section 401(b) of the Uniform Securities Act, from which section 80A.14, subd. 3, of the Minnesota act is taken, states that establishing agency under the act "depends upon much the same factors which create an agency relationship at common law." Uniform Securities Act § 401(b) comment.

At common law, agency existed if the principal had the right to control the agent's conduct in performing the service. *Jenson v. Touche Ross & Co.*, 335 N.W.2d 720, 729 (Minn.1983). Clapp alleged no specific facts which would suggest that Autocraft or Fuller exercised or attempted to exercise any control over Norwest or that Norwest assented to act subject to Fuller's or Autocraft's control. Accordingly, Clapp's defense of securities fraud fails as a matter of law because Norwest did not operate as an agent of Fuller or Autocraft by materially aiding in the sale of stock.

■ 2. Clapp's defense of fraud, based upon Norwest's failure to disclose facts relating to the transaction, also fails as a matter of law because Norwest owed no duty to disclose information to him.

■ Norwest had no duty to disclose because no fiduciary or confidential relationship existed between Clapp and Norwest. In Minnesota, a bank has no duty to disclose unless a fiduciary relationship exists:

> We believe the correct rule to be that when a bank transacts business with a depositor or other customer, it has no special duty to counsel the customer and inform him of every material fact relating to the transaction—including the bank's motive, if material, for participating in the transaction—unless special circumstances exist, such as where the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and is relying on the bank so to counsel and inform him.

*Klein v. First Edina National Bank*, 293 Minn. 418, 422, 196 N.W.2d 619, 623 (1972).

In *Klein*, the court found "no evidence in the record to indicate that defendant ought to have known that plaintiff was placing her trust and confidence in defendant and was depending on defendant to look out for her interests." *Id.* In this case, Pike had no reason to believe that Clapp intended Pike to look after his interests. Clapp never told Pike on either of the two occasions they met that he intended Pike to look out for his interests; Pike never told him he would look out for his interests.

In *Klein*, the fact that plaintiff had done business with defendant for nearly 20 years was insufficient to give the bank reason to believe that plaintiff relied on it. *Id.* In comparison, Pike had much less reason to believe that Clapp was relying on him. Clapp had met Pike only once before the financing at a luncheon. The financing meeting at the bank lasted only ten minutes. If Klein's twenty-year relationship with her banker was insufficient to establish reliance, certainly Clapp's relationship with Pike was insufficient.

■ In addition to the confidence element noted by the *Klein* court, a fiduciary relationship may exist when the party relied upon has superior knowledge. In *Midland National Bank v. Perranoski*, 299 N.W.2d 404 (Minn.1980), the supreme court stated that "[a] fiduciary relationship exists when confidence is reposed on one side and there is resulting superiority [and influence] on the other * * *." *Id.* at 413 (quoting *Stark v. Equitable Life Assurance Society*, 205 Minn. 138, 145, 285 N.W. 466, 470 (1939).

Certainly Clapp had superior knowledge about the financial status of Autocraft. He was on the Board of Directors of Autocraft. He was a sophisticated investor. He knew the financial status of Autocraft and assisted in drafting the private placement memorandum, advising of extensive risks assumed in investing in Autocraft and including a statement that the investment capital would be used to reduce Autocraft's outstanding debts. In this regard, perhaps he was more aware of Autocraft's financial situation than Pike.

Norwest had an interest in protecting its previous loans, but its failure to disclose that aspect of the transaction does not amount to fraud. Absent reliance, Norwest is under no duty to disclose information relevant to a borrower's transaction. Accordingly, the trial court correctly found Clapp failed to prove his defense of common law fraud as a matter of law.

## DECISION

The trial court did not err in entering summary judgment in favor of Norwest. Norwest was entitled to prevail as a matter of law.

Affirmed.