CITY OF BURNSVILLE, Appellant,

v.

CHICAGO BRIDGE & IRON COMPANY, Orr-Schelen-Mayeron & Assoc., Inc., Respondents.

No. C3–86–2127.

Court of Appeals of Minnesota.

July 21, 1987.

Lee F. Haskell, Cosgrove & Haskell, Minneapolis, for City of Burnsville.

Steven K. Champlin, Dorsey & Whitney, Minneapolis, for Chicago Bridge & Iron Company.

Robert E. Salmon and Thomas L. Adams, Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Minneapolis, for Orr-Schelen-Mayeron & Assoc., Inc.

Heard, considered and decided by LANSING, P.J., and HUSPENI and RANDALL, JJ.

## OPINION

HUSPENI, Judge.

Appellant the City of Burnsville (Burnsville) brought breach of contract and negligence actions against respondents Orr-Schelen-Mayeron and Associates (OSM) and Chicago Bridge and Iron Co. (CBI) regarding construction of a water storage standpipe. The trial court directed a verdict against Burnsville on the breach of contract claim and submitted the negligence claim to the jury. On appeal, Burnsville argues that the trial court erred in concluding that there was no evidence of breach of contract and that the jury's damage finding on the negligence claim is contrary to the evidence. We affirm.

## FACTS

In 1970 Burnsville contracted with OSM to write performance specifications for a water storage standpipe. The specifications were the basis for a 1971 contract between Burnsville and CBI for design and construction of the standpipe. OSM supervised construction, which was completed in October of 1973. Burnsville began using the standpipe the following month.

Burnsville officials discovered in July of 1979 that a portion of the roof of the standpipe had collapsed. The damage apparently occurred during the preceding winter. Repairs were made, along with changing the roof from a ten truss system to twenty trusses. The total cost of the work was $406,000.

In a suit against both OSM and CBI, Burnsville alleged negligence relating to failure to remove certain construction braces from the roof trusses. Burnsville also claimed breach of contract for failure to comply with a contract provision that the standpipe meet American Water Works Association (AWWA) standards. One of the standards provides that "roof trusses shall be placed above the maximum water line in climates where ice may form." Burnsville alleged that this standard was not met and that as a result ice formed on the trusses, eventually causing the roof to collapse. OSM and CBI asserted that Burnsville was negligent in its operation of the standpipe and that it was the city's negligence that caused the damage.

At trial, Burnsville presented evidence to the jury relating to both the negligence and breach of contract claims. The trial court directed a verdict against Burnsville on the breach of contract cause of action, allowing

the jury to consider only the negligence allegation. The jury returned a special verdict finding that OSM was not negligent but that Burnsville was 70 percent at fault and CBI was 30 percent at fault. Damages were found to be $87,000. Under the Comparative Fault Statute, Minn.Stat. § 604.01 (1986), Burnsville was precluded from recovering any of its damages.

## ISSUES

1. Did the trial court err in directing a verdict against Burnsville's breach of contract cause of action?

2. Is the jury's finding on the amount of damages contrary to the evidence?

## ANALYSIS

### I.

■ OSM and CBI argue that it is unnecessary to address whether the trial court erred in directing a verdict on the breach of contract claim because the jury's finding that Burnsville was 70 percent at fault would bar recovery even if the jury were to find that the contract had been breached. We recognize that the applicability of comparative fault to contract actions has not been clearly resolved in Minnesota. *See* Espel, Liability and Loss Allocation for Economic Losses in Construction Litigation Involving Design Professionals, 13 Wm. Mitchell L.Rev. 81, 113–121 (1987). We further note that

> [i]f the courts are persuaded that damages having to do with building conditions are inextricably related to maintenance as well as construction practices, then it would seem that comparative fault might be required for a fair allocation of responsibility.

*Id.* at 118. OSM and CBI contend that Burnsville's negligence in operating and maintaining the standpipe is related to the damages. However, because of the circumstances of this case, we must conclude that this is not a proper vehicle to determine whether comparative fault concepts apply to contract claims.

Here, the negligence claim is based on the failure to remove construction braces from the roof trusses. In contrast, the contract action is based on the designed distance between the trusses and the maximum water line. Because the actions have separate factual bases, we cannot presume that the jury would apportion fault in the contract action in the same manner that it had in the negligence action. Consequently, even if we were to conclude that comparative fault is applicable, we could not conclude that Burnsville would be unable to recover because of the jury's allocation of fault. We must therefore review the directed verdict.

The standard for reviewing a directed verdict requires determining whether, as a matter of law, the evidence is sufficient to present a fact question for the jury's consideration. In making this decision, the court must view the credibility of the evidence, and every inference which may fairly be drawn therefrom, in favor of the adverse party. The court should grant the motion only when it would clearly be its duty to set aside a contrary verdict as manifestly against the evidence or when such a verdict would not comply with the applicable law.

*Dean Van Horn Consulting Associates, Inc. v. Wold,* 367 N.W.2d 556, 559 (Minn.Ct. App.), *pet. for rev. denied,* (Minn. July 17, 1985) (citing *Midland National Bank v. Perranoski,* 299 N.W.2d 404, 409 (Minn. 1980)).

In directing the verdict, the trial court concluded that "there was insufficient evidence to submit the contract claim to the jury since there was compliance with all AWWA standards set forth in the contract." Burnsville argues that through an expert witness it presented evidence of a failure to comply with the AWWA standard on placement of the trusses, thereby indicating a breach of the contract.

Burnsville's expert, civil engineer Donald Johnson, testified that the trusses were placed above the overflows which drain water from the standpipe when the water reaches a certain level. However, Johnson contended that a head of water builds up above the overflows and that the trusses were not placed far enough above the over-

flows to avoid being inundated by this head. Johnson said that this inundation during the winter allowed ice to form on the trusses, adding so much weight that the roof structure was pulled down. According to Johnson, the AWWA standard required that the trusses be placed above the level that could be reached by the head, which he described as the maximum water level in the standpipe, rather than at a point merely above the overflows. In his direct testimony, he said a head of four feet was possible in the Burnsville standpipe but the trusses were located only six and 11/16 inches above the overflows. It was his opinion that the design did not comply with the AWWA standard.

On cross-examination, Johnson affirmed a statement from his deposition that it was his personal preference, rather than an AWWA standard, to leave a distance of more than six inches between the overflow line and the bottom of the trusses. He also acknowledged that he did not know how large a head could have been built up in the Burnsville standpipe:

Q. So you have got a weir [on the overflow] of 20,000 gallons per minute and the pipe that leads out at the bottom [of the standpipe] of 16,000 gallons per minute, right?

A. Right.

Q. But what you are saying is that before this weir of 20,000 gallons per minute will be accommodated by the pipe that takes 16,000 gallons per minute, you're going to build up a head of four feet?

A. That's correct.

Q. And that's the four feet you are talking about?

A. That's correct.

Q. And you are in no way attempting to tell me or to tell the jury that under actual operating conditions you ever get a head of four feet?

A. I have no idea what their operating range was.

Q. You never looked into that?

A. No.

Q. And in fact, among other things that you would have to look at, would you not, is the size of the pipe that's bringing water into the [standpipe] down here, would you not?

A. That's correct.

Q. And the amount of friction or the amount of resistance that the size of that pipe imposes upon the in-flow of water?

A. That is correct.

Q. And only when you know that component, perhaps among other things, will you ever really know what the actual head is up there at the overflow line?

A. That is correct.

Q. And you have never undertaken to establish that?

A. Nope.

Q. So you are not trying to tell me or tell the jury that in fact this tank, from time to time, would establish a four-foot head?

A. That's correct.

Q. And you don't know what head that tank would establish under actual operating conditions?

A. No, I don't.

■■■■ While an expert may testify on direct examination in terms of opinion without disclosing the underlying facts or data, that information may be required on cross-examination. Minn.R.Evid. 705. Here, OSM and CBI through cross-examination of Johnson explored the calculations he had made in order to conclude that the AWWA standard had not been met. The examination reveals that a critical piece of information was not included in the calculation. Johnson did not consider the rate of water entering the standpipe and therefore could not determine the head of water that could be built up in this particular standpipe. While it may be possible that a head greater than six and 11/16 inches could result, there is no evidence in the record to support such a conclusion. There is therefore no evidence that the design placed the roof trusses in an area that could be reached by the head.

Burnsville argues that the physical evidence indicates that the head was large enough to repeatedly inundate the trusses. The city points to evidence of paint damage at a uniform point on all of the trusses as

showing that the trusses must have gotten wet before the roof began to collapse. If the paint damage had occurred after the collapse, Burnsville contends it would not have been at the same level across the trusses. At some points the damage would have been higher than on others.

Even if we accept this argument, it does not demonstrate that the trusses were placed within the maximum water level in violation of the AWWA standard. In effect, Burnsville argues only that because the trusses got wet, there must have been noncompliance with the standard, without producing evidence relating to the design of the standpipe. Such evidence is needed in order to show noncompliance with the AWWA design standard and consequently breach of contract. Because Burnsville failed to provide that evidence, we must conclude that the trial court properly directed a verdict due to an insufficiency of evidence to create a fact question for the jury's consideration.

## II.

Burnsville does not contest the jury's apportionment of fault on its negligence claim and acknowledges that Minn.Stat. § 604.01 (1986) precludes recovery of damages on that theory due to the apportionment of fault. However, in regard to its contract claim, Burnsville contends that the jury's finding of damages of $87,000 is contrary to the evidence showing damages of $406,000. Because we affirm the directed verdict on the contract claim, in effect finding no liability on the part of OSM or CBI, the issue of assessment of damages is rendered moot. *See Buzzell v. Bliss*, 358 N.W.2d 695, 700 (Minn.Ct.App.1984), *pet. for rev. denied*, (Minn. Mar. 13, 1985) (quoting *Wefel v. Norman*, 296 Minn. 506, 507, 207 N.W.2d 340, 341 (1973)).

## DECISION

The trial court did not err in directing a verdict on the breach of contract claim.

Affirmed.