# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 15-3346

———————————————

OmegaGenesis Corporation

*Plaintiff - Appellant*

v.

Mayo Foundation for Medical Education and Research

*Defendant - Appellee*

——————————

Appeal from United States District Court
for the District of Minnesota - Minneapolis

——————————

Submitted: October 20, 2016
Filed: March 20, 2017

——————————

Before RILEY, Chief Judge,[1] LOKEN and BENTON, Circuit Judges.

——————————

LOKEN, Circuit Judge.

OmegaGenesis Corporation (Omega) filed this diversity action against Mayo Foundation for Medical Education and Research (Mayo), a Minnesota charitable

———————————————

[1]The Honorable William Jay Riley stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 10, 2017. He has been succeeded by the Honorable Lavenski R. Smith.

corporation, asserting claims of fraud, negligent misrepresentation, breach of contract, and breach of the implied covenant of good faith and fair dealing. The lawsuit arises out of an Exclusive Patent License Agreement (the Agreement) in which Omega, a start-up company, agreed to pursue Mayo's pending patent application, to develop and market licensed products "described by a pending claim" in that application, to grant Mayo ten percent of Omega stock, and to pay Mayo royalties of five percent of licensed product net sales. The patent application was abandoned after the U.S. Patent and Trademark Office denied an elected group of claims as anticipated by prior art. See 35 U.S.C. § 102(a)(1). Omega alleges that it suffered damages because it relied on Mayo's pre-Agreement false representations that it developed the technology and on Mayo's failure to disclose knowledge of prior art that made the technology unpatentable. The district court[2] dismissed all claims. OmegaGenesis Corp. v. Mayo Found. for Med. Educ. & Research, 132 F. Supp. 3d 1119 (D. Minn. 2015). Omega appeals dismissal of its fraud and negligent misrepresentation claims. Reviewing the grant of a motion to dismiss *de novo*, we affirm. Quintero Cmty. Ass'n Inc. v. F.D.I.C., 792 F.3d 1002, 1008 (8th Cir. 2015).

## I. Background.

We take background facts from the Omega Complaint, assuming the truth of its fact allegations, and from the Agreement and portions of the patent application file placed in the record without objection by a Declaration of Mayo's attorney before the district court ruled on Mayo's motion to dismiss. See Enervations, Inc. v. Minn. Min. & Mfg. Co., 380 F.3d 1066, 1069 (8th Cir. 2004); Vitek Sys., Inc. v. Abbott Labs., 675 F.2d 190, 192 n.4 (8th Cir. 1982); Fed. R. Evid. 201.

---

[2]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

The September 2008 Agreement recited that Mayo wished to make intellectual property rights available "for the development and commercialization of products, methods and processes . . . including nano rod technology," and that Omega "represents itself as being knowledgeable in developing and commercializing nano rod technology." The Agreement granted Omega an exclusive license to make, use, and sell the Licensed Products, and a non-exclusive license to use the Know-How to develop and sell the Licensed Products. The Agreement defined "Licensed Product" to include "any product or process" described by a claim in the pending patent application, and defined "Know-How" as including technical data, trade secrets, and supportive information "owned and controlled by Mayo . . . to the extent it is reasonably related to [the patent application] as developed in the laboratory of Dr. Debabrata Mukhopadhyay or any person working under his direction or control."

In Section 9.01(b) of the lengthy Agreement, Omega warranted that it had "independently evaluated the Patent Rights, Know-How, and Confidential Information . . . [and] is entering into this Agreement on the basis of its own evaluation and not in reliance o[n] any representation by Mayo . . . ." Section 9.03 stated that Mayo was providing the Know-How, confidential information, and patent rights "as is," "with all faults," and "with all defects," and expressly disclaimed any implied warranties with respect to the "scope, validity or enforceability of the patent rights or Know-How," or that any patent will issue based upon any pending patent application. Section 11.03 provided that the "terms and conditions of this Agreement, as well as all disputes arising under or relating to this Agreement, shall be governed by Minnesota law, specifically excluding its choice-of-law principles." An "Entire Agreement" provision, Section 11.08, stated that the Agreement superseded all prior discussions, proposals, promises, and understandings.

Omega's Complaint alleged that its CEO had "substantial experience and contacts with medical technology and venture capital" and formed Omega in response to representations by Mayo that it "had developed and [was] in the process of

patenting certain technology related to angiogenesis, which is the creation of blood vessels." After entering into the Agreement, the Complaint alleges, Omega held an "investor conference" on October 14, 2008 that raised $500,000, entitling Mayo to acquire Omega stock. At the conference, the claimed inventors, Dr. Mukhopadhyay and Dr. Chittaranjan Patra, "presented their claimed discovery and patents." However, Mayo "refused to assist OmegaGenesis in prosecuting the patents." "Ultimately, the patent was denied due to the existence of prior art."

We set forth the factual allegations relating to Omega's claims of fraud and negligent misrepresentation, the only claims at issue on appeal:

-- In the Agreement, Mayo represented that it owned the technology that was the subject of the pending patent application, and that the Know-How had been "developed in the laboratory of Dr. Debabrata Mukhopadhyay or any person working under his direction or control."

-- "During the negotiations . . . [Mayo] employees claimed to have spent substantial time developing the technology." A February 20, 2008 email stated that "the nanotechnology venture was the brainchild of Debabrata Mukhopadhyay." In a March 4, 2008 email, Dr. Mukhopadhyay sent "highlights of our research work" and the patent application, which includes a representation that the claimed inventors do not know of prior art that would "change that conclusion." At a June 2008 meeting, Mayo presented the discovery and patent filing, introduced lab staff "as the discoverers of the nanoparticle angiogenesis effect," and introduced Patra as the "lead person."

-- Mayo refused to provide Omega inventors notebooks, test results, and other information Omega requested for its due diligence but assured Omega "of the legitimacy of the development of the technology."

-- "The prior art revealed that the exact same invention had already been developed at Bar Ilan University in Israel." Patra, a claimed inventor, "was a graduate assistant at the Bar Ilan University at the time of the development of the prior art." Like Patra, "one of the graduate assistants working on the project at Bar Ilan was also a student from India. At a minimum, Patra had to have known of the Bar Ilan prior art."

-- "[T]he representations that [Mayo] had developed anything were untrue." Mayo "either failed to actually do any work and just relied on the prior art or merely mimicked the prior work." Mayo had not developed the technology and "knew or should have known that it could not be patented." Mayo, "through at least one of its employees, knew about the prior art and invention."

-- Omega "reasonably relied" on Mayo's representations.

Mayo moved to dismiss the Complaint, arguing that it failed to state a claim for fraud or negligent misrepresentation because justifiable reliance is an element of these claims, and the disclaimers in Sections 9.01(b) and 9.03(b) of the Agreement made Omega's alleged reliance on statements by Mayo regarding patentability and development of the licensed technology unreasonable as a matter of law. The district court agreed. OmegaGenesis, 132 F. Supp. 3d at 1125-26. This appeal followed.

## II. Discussion.

To survive Mayo's motion to dismiss for failure to state a claim, the Complaint must show that Omega "is entitled to relief," Fed. R. Civ. P. 8(a)(2), by alleging "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). To state a plausible claim, the Complaint

must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

Rule 9(b) imposes heightened pleading requirements for claims grounded in fraud: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Rule 9(b) requires that a fraud claim "specify the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts." Streambend Props. II, LLC v. Ivy Tower Mpls., LLC, 781 F.3d 1003, 1013 (8th Cir. 2015). Required facts include the "who, what, when, where and how surrounding the alleged fraud . . . and what was obtained as a result." Quintero, 792 F.3d at 1010. Although Rule 9(b) allows general allegations of knowledge and intent, "'generally' is a relative term. . . . [Rule 9(b)] does not give [a pleader] license to evade the less rigid -- though still operative -- strictures of Rule 8." Iqbal, 566 U.S. at 686-87.

To prevail on a claim of fraud under Minnesota law, Omega must prove "both actual and reasonable reliance," which is "ordinarily a fact question for the jury." Hoyt Props., Inc. v. Prod. Res. Grp., 736 N.W.2d 313, 321 (Minn. 2007). The parties agree that reasonable reliance is also an element of a negligent misrepresentation claim under Minnesota and California law. The Complaint pleaded, generally, that Omega "reasonably relied" on Mayo's alleged false representations that it independently developed the licensed technology. In general, a contracting party cannot reasonably rely on alleged misrepresentations that are "contrary to the express provisions of the written agreement," Syverson v. Firepond, Inc., 383 F.3d 745, 750 (8th Cir. 2004). Mayo argued, and the district court agreed, that the disclaimers in Sections 9.01(b) and 9.03(b) of the Agreement preclude Omega from proving that it justifiably relied on Mayo's alleged fraud. On appeal, Omega relies on the principle that a contract provision "negatives a claim of fraud" only where it "explicitly states

-6-

a fact completely antithetical to the claimed misrepresentations"; absent such a specific contradiction, "general disclaimer[s]" such as Sections 9.01(b) and 9.03(b) are "ineffective to negate reliance." Commercial Prop. Invs., Inc. v. Quality Inns Int'l, Inc., 938 F.2d 870, 875 (8th Cir. 1991) (quotations omitted). Here, Omega argues, the "underlying misrepresentation . . . that Mayo independently developed the technology" is not directly contradicted by or antithetical to any provision of the Agreement. Mayo responds that Sections 9.01(b) and 9.03(b) are specific disclaimers relating to development and patentability of the licensed technology that refute Omega's claim of reasonable reliance as a matter of law.

Whether Sections 9.01(b) and 9.03(b) of the Agreement specifically disclaim reliance necessarily turns on the fraud alleged. "A charge of fraud can be based only on a material representation. . . . A representation is not material unless it prejudices the party or is germane to the fraud alleged." Rien v. Cooper, 1 N.W.2d 847, 851 (Minn. 1942). "Reliance in fraud cases is generally evaluated in the context of the aggrieved party's intelligence, experience, and opportunity to investigate the facts at issue." Valspar Refinish, Inc. v. Gaylord's, Inc., 764 N.W.2d 359, 369 (Minn. 2009). When we compare the above-quoted allegations in the Complaint with the Agreement and the patent application documents that are part of the Rule 12 record on appeal, we conclude that Omega has failed to plead fraud and negligent misrepresentation with sufficient particularity to state a plausible claim of justifiable reliance. "[W]e may affirm the district court's decision on any ground supported by the record." Streambend, 781 F.3d at 1013 (quotation omitted).

The Agreement recited that Mayo wished to develop and commercialize "products, methods and processes . . . including nano rod technology," and that Omega is "knowledgeable in developing and commercializing nano rod technology." The Agreement's terms identified a specific patent application but did not describe its claims or the technology it encompassed. The Complaint alleged that Mayo was in the process of patenting "certain technology related to angiogenesis." The only

reference to angiogenesis in the Agreement was in Exhibit B, a summary of "experiments carried out from October 2005 to July 31, 2008, as described and reported by Mayo," in which "europium hydroxide nanorods" were synthesized, and it was repeatedly observed that "europium hydroxide nanorods" stimulate "endothelial cell proliferation," which is "one of the critical and basic steps in angiogenesis."

The Complaint does not allege which specific representations Omega relied on, why that reliance was reasonable, and what actions Omega took in reliance on specific representations. The broad allegations that Mayo "failed to actually do any work and just relied on the prior art," and "had not developed the technology," are factually plausible only if the allegedly known but undisclosed prior art anticipated *all* of the work described in Exhibit B -- a method for synthesizing europium hydroxide nanorods, *and* experiments in which those nanorods stimulated endothelial cell proliferation, one of the critical steps in angiogenesis.

After entering into the Agreement, Omega continued to pursue a patent. In July 2011, the Patent Office required the applicant to elect a single group of claims because the thirteen claims included in the application "do not relate to a single general inventive concept." Claims 1-5 were "drawn to a method for making lanthanide hydroxide nanoparticles." Claims 6-8 were "drawn to lanthanide hydroxide nanoparticles." Claims 9-13 were "drawn to a method of promoting angiogenesis." In October 2011, the applicant elected and amended claims 1-5 and withdrew claims 6-13 "without traverse." The Complaint alleged that Mayo refused to assist in prosecuting the patent application, so the only plausible inference is that Omega made this election more than three years after entering into the Agreement. The filing described Amended Claim 1 as a "method for making lanthanide hydroxide nanoparticles, wherein said method comprises microwave heating a mixture of lanthanide nitrate and aqueous ammonium hydroxide." In amended claims 2-4, the "lanthanide is europium," and the "nanoparticles are europium hydroxide nanorods."

-8-

In November 2011, the Patent Office mailed a *non-final* action rejecting claims 1-5 as anticipated by prior art. The Patent Office identified the prior art as entitled Synthesis of Europium Oxide Nanorods by Ultrasounds Irradiation, published in 2002 in Volume 106 of the Journal of Physics and Chemistry, a publication of the American Chemical Society. The Examiner explained that the prior art "teaches reaction of europium nitrate pentahydrate and aqueous ammonia under microwave irradiation" to produce europium hydroxide nanoparticles. This prior art related only to a method of producing europium hydroxide nanoparticles. Though it referred to "much progress in the . . . fabrication of nanomaterials [and] in the potential applications of these materials in the wide variety of technologies," it never mentioned angiogenesis. Thus, the rejection of claims 1-5 as anticipated by this prior art does not plausibly support the allegations that Mayo "had not developed the technology" related to angiogenesis and "either failed to actually do any work and just relied on the prior art or merely mimicked the prior work." The Complaint does not allege with particularity what Mayo mimicked, despite the listing of experiments carried out at Mayo in Exhibit B of the Agreement.

Significantly, the Agreement recited that Omega represented it was "knowledgeable in developing and commercializing nano rod technology." Section 9.01(b) represented that Omega "independently evaluated the Patent Rights," and the Complaint alleged that Omega's CEO "had substantial experience and contacts with medical technology and venture capital." The prior art could presumably have been uncovered with reasonable investigation, yet the Complaint failed to allege why Omega, a company "knowledgeable . . . in developing and commercializing nano rod technology" that conducted its own due diligence, failed to find and evaluate the published prior art, instead reasonably relying on Mayo's non-disclosure of this prior work in the field. See Midland Nat'l Bank v. Perranoski, 299 N.W.2d 404, 412 (Minn. 1980) ("fraud is proved with reference to the specific intelligence and experience of the aggrieved party rather than a reasonable-man standard").

The record includes a June 2012 final action by the Patent Office declaring the application abandoned for lack of a reply to its non-final rejection of claims 1-5. This means that Omega first made the decision to withdraw claims 9-13 from consideration, the only claims relating to "a method of promoting angiogenesis," and then decided not to pursue patenting of the withdrawn claims or to challenge the Examiner's rejection of claims 1-5. Omega's decision to abandon the application when five of thirteen claims were rejected does not make plausible its allegation that Mayo did no original work to develop any aspect of the thirteen claims.

The Complaint only generally pleads that Omega "reasonably relied." It fails to allege the "who, what, when, where and how surrounding" this element of the alleged fraud. Without those Rule 9(b) specifics, the Complaint fails to allege, as Rule 8(a)(2) requires, fraud and negligent representation claims that are plausible on their face. The allegation that Mayo was aware of the prior art because Dr. Patra attended the university where it was developed, and "one of the graduate assistants working on the project at Bar Ilan was also a student from India," is not plausible on its face. Omega does not allege facts suggesting how Dr. Patra accessed the know-how reflected in the published prior art, information that could presumably have been uncovered with reasonable investigation. And even if the Complaint raises an inference that Mayo had some knowledge of published prior work that the Patent Office *might* conclude is prior art, this does not make plausible the allegation that Mayo "knew or should have known" the invention was unpatentable; most patentable new inventions build on prior work. Cf. Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1330-31 (Fed. Cir. 2009). And perhaps most importantly, knowledge of prior art for producing europium hydroxide nanorods does not even suggest that Mayo did *no* research and development on the withdrawn claims for "a method of promoting angiogenesis," which apparently was Omega's primary interest in securing the Agreement.

A complaint grounded in fraud does not "suffice if it tenders naked assertions devoid of further factual enhancement." <u>Quintero</u>, 792 F.3d at 1009, quoting <u>Iqbal</u>, 556 U.S. at 678. Here, the lack of particularity makes Omega's general allegation of reasonable reliance not plausible. It is inherently implausible that Mayo would incur the expense of a patent application based entirely on mimicking known prior art, and then enter into a licensing agreement in which Mayo's success depended entirely upon Omega's success, based upon fraudulent representations that it had independently developed the technology being licensed. The Agreement and the patent application file squarely contradict Omega's general, conclusory allegation of reasonable reliance. The district court properly dismissed these claims grounded in fraud for failure to state plausible claims of reasonable reliance. Like the district court, we need not resolve the parties' disagreement as to whether Omega's negligent misrepresentation claim is governed by Minnesota or California law. <u>See</u> <u>OmegaGenesis Corp.</u>, 132 F. Supp. 3d at 1125-26.

The judgment of the district court is affirmed.

_____